325 So.2d 255 (1975)
STATE of Louisiana
v.
Charles Spurgen BRYANT, III.
No. 55904.
Supreme Court of Louisiana.
July 25, 1975.
On Rehearing January 1, 1976.
*256 *257 Thos. W. Davenport, Jr., Davenport, Files & Kelly, Monroe, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Carl Parkerson, Dist. Atty., John R. Harrison, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
Defendant, Charles Spurgen Bryant, was indicted for the crime of aggravated rape. After a trial by jury, he was found guilty as charged on June 5, 1974. On June 27, 1974 he was sentenced to death. On this appeal eight assignments of error are relied upon for reversal of his conviction and sentence.

Errors 1 and 5
The trial judge denied a motion to suppress evidence consisting of a hunting knife, its sheath and a .22 caliber pistol used in the crime. Later these objects were introduced at the trial over a defense objection.
An investigation was under way by the Ouachita Parish Sheriff's office and City Officers of Monroe regarding a report that late in the evening of December 18, 1973 a coed at Northeast Louisiana University had been forcibly raped. In the course of the investigation it was learned on December 19, 1973 that defendant was incarcerated in the parish jail, having been arrested by the State Police for a traffic violation. When he was booked on the traffic charge earlier, defendant had the knife in question on his person, which he surrendered to the jailer. The knife was then inventoried and placed in a "property bag" for safekeeping until the time when it was to be returned to defendant.
Also, when he was arrested, with his consent, his automobile was towed to a local service station for storage. The unlocked glove compartment of the car then contained the pistol used in the crime.
Copes, whose service station was on the State Police list for towing service, testified that the State Police requested that he tow the car in to his place of business for safekeeping. For his own protection, because he was responsible for the car and its contents, and on his own initiative, he searched the car for valuables which could be stolen while the vehicle was impounded. In doing so he found the gun in the unlocked glove compartment, locked it in his office and informed the State Police. Until Deputy Strueben of the sheriff's office called the next day, Copes had no contact with the sheriff's office. Strueben testified that when defendant told them where the car was, he went to the service station to make sure it was there so that he could *258 obtain a search warrant. As he walked up, Copes came out and handed him the gun. He did not ask Copes to get the gun out of the car, in fact, he never saw the car.
Defendant contends both seizures were made without a warrant and without his permission or consent. The argument is that the searches were too remote in time to be incidental to his traffic arrest. He asserts that loss of possession of his property because of his arrest did not strip him of the constitutional protection against unreasonable search and seizure. Under the circumstances there was no likelihood that the knife and gun would be lost or destroyed and, according to defendant, there was ample time to obtain a warrant.
The State contends that the search of the property bag was a reasonable routine inventory search and the fruit of the search was clearly admissible. As to the car, the service station owner, on his own initiative, discovered and removed the pistol for safekeeping and then turned it over to a deputy. There was, therefore, no governmental action to which the protection of the Fourth Amendment would extend.
After talking with the defendant, who freely admitted the crime and told them where the weapons were, the Sheriff's officers obtained the knife from the jailer and the gun from the owner of the service station where the car was in storage.
This is the first question: Does the taking of the knife from the property bag in the jailer's custody constitute an unreasonable search and seizure? Routine police procedure for safekeeping of valuables cannot realistically or logically be regarded as a search, for it involves no intention or purpose to locate evidence of a crime. When the knife was taken into custody, defendant had only been arrested for a traffic violation and he was not under suspicion for aggravated rape. Stowing the knife for safekeeping, then, was neither a search nor a seizure in the sense that evidence of a crime was involved. United States v. Blackburn, 389 F.2d 93 (6th Cir. 1968).
"A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest." Haerr v. United States, 240 F.2d 533 (5th Cir. 1957), approved in United States v. Blackburn, supra.

It is standard police procedure for the police to store physical objects found in the possession of persons they have taken into custody. "Custody must of necessity be asserted initially over whatever the arrested party has in his possession at the time of the apprehension." Charles v. United States, 278 F.2d 386 (9th Cir. 1960). "Search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Since it was permissible to search defendant at the time of his arrest, objects impounded by law enforcement officials at the time of his arrest are thereafter subject to search and seizure while impounded. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). They had a right to examine him at the time of his arrest, and if the examination produced evidence of other crimes than the offense for which he was arrested he is without a right to complain. His rights were not violated. United States v. Gardner, 480 F.2d 929 (10th Cir. 1973), cert. denied, 414 U.S. 977, 94 S.Ct. 297, 38 L. Ed.2d 220; Evalt v. United States, 382 F. 2d 424 (9th Cir. 1967); Baskerville v. United States, 227 F.2d 454 (10th Cir. 1955); United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); United States, 227 F.2d 454 (10th Cir. (5th Cir. 1970), cert. denied, 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331, reh. denied, 402 U.S. 966, 91 S.Ct. 1635, 29 L.Ed.2d *259 131; Cotton v. United States, 371 F.2d 385 (9th Cir. 1967).
Since defendant had previously been lawfully deprived of the possession of the knife, and the custody and control of that object was legitimately under the dominion of the police, it was not an unreasonable search and seizure for the police to use it as evidence of another crime.
Next, was the seizure of the pistol, for which no search was necessary, within constitutionally permissible standards of reasonableness? It is, of course, state action which is the basic factor in this consideration, for a search by a private person does not come within the ambit of the Fourth Amendment's protection; that protection applies to governmental action. It was intended as a restraint upon the activities of sovereign authority, and not a limitation upon other than governmental agencies. With that in mind, the question is does the action of the service station operator constitute state action. Did he act as an agent of the state in the inventory search he conducted of defendant's car?
Copes testified that he conducted the search for his own protection against liability which would arise if it were claimed that articles in the car were missing while it was stored under his care. The search was not made at the request of the police or on orders from them. And the deputy to whom he handed the gun the moment he arrived did not search the car. Copes' actions cannot be attributed to law enforcement officials merely because his business was listed, like others, to be called upon in its proper turn to perform the service of towing cars to a place of safety.
This search for the pistol, therefore, was conducted by a private individual, not law enforcement officials. There was, therefore, no state action reprobated by the constitution. Hence these facts do not support the motion to suppress. La.Code Crim. Proc. art. 703. It should be noted, moreover, that in his confession and during the trial, defendant freely admitted using both weapons to perpetrate this rape.
This assignment of error has no merit.

Errors 2 and 4
Based upon a defense motion to suppress inculpatory statements and confessions obtained by sheriff's deputies, a hearing was held at which the motion was denied.
Defendant asserts he was denied counsel and at first declined to make the statements claiming his right against self-incrimination.
At the hearing on this motion it was shown that defendant gave three detailed recorded confessions after having signed a waiver of his rights prior to each. At first defendant talked treely about his crime; however, when the police attempted to record his confession, he refused to allow it to be taped, stating that he feared it would be played in public, or his wife would hear it. All the while, however, he had no objection to an oral confession which was not recorded, indicating that he would not mind writing the confession. Finally, defendant contends, after he was assured that it would not be played in public, he repeated his confession so that it could be recorded.
Although admitting that he knew his confessions would be used against him, he contends that he would not have made the recorded confession if he had known it would be played in the courtroom. He argues that he was assured it would only be played in chambers for his lawyer, the sheriff and the district attorney. The deputies responsible for obtaining the confession testified they did not promise him it would not be played in court.
As a matter of fact, the recorded confession was not offered into evidence and the recordings were not played to the jury. The State relied solely on the testimony of the deputies to whom defendant *260 orally related his actions and his confession. With respect to these oral confessions, no misrepresentations were made by the sheriff's deputies to induce them, and they were freely and voluntarily made.
This assignment has no merit.

Errors 3 and 6
Defendant contends that the trial judge erred when he refused to suppress the lineup identification and when he allowed testimony concerning this identification at the trial. When the victims were told a suspect was in jail in custody, the defense contends, the lineup with five other inmates was unduly suggestive because the other participants were wearing variations of street cloths (sport shirts, Tshirts, jeans, etc.) whereas defendant was wearing a jumpsuit bearing the stamp "Ouachita Parish Jail" over the left front breast pocket. This marking on his clothes, defendant argues, together with the fact that the victim had been advised that the suspect was in jail, suggested to the victim that defendant was the person involved in the crime.
The jumpsuit worn by defendant was the type commonly worn on the streets. There was nothing distinctive about this garb which would set the wearer apart as a person in custody. Furthermore, the stamp on the pocket was not visible to the victims, being obscured by a paper card pinned over it. This card bore defendant's lineup number, and was identical to cards similarly placed on the other participants in the lineup.
A view of the photograph of the lineup is convincing. All of the participants were similar in appearance. Most importantly, however, is the fact that the victim testified that she recognized defendant immediately and paid little attention to his clothes or the other participants, a fact which is easily understood when it is known that she was in close proximity to defendant for approximately five hours on the night of the offense.

Error 7
This assignment of error must be considered in light of the fact that none of the recorded inculpatory statements made by the defendant were introduced into evidence or played to the jury. The transcript does make clear, however, that the existence of these recorded confessions and the failure of the prosecution to introduce them into evidence was established by the defense. It was a defense tactic obviously employed with the expectation that this omission on the part of the prosecution would give rise to the inference that the recordings would exculpate the defendant. In furtherance of this notion defendant called a deputy clerk and introduced a certified copy of the minutes showing that his motion to suppress the recordings had been overruled. He also called the deputy sheriff who obtained the confession. This officer testified to the existence of the tapes and their length. Twice, during this stage of the trial, the prosecutor, in the presence of the jury, stated that the State had no objection to the tapes being played and offered to join with defendant in introducing them; this defense counsel declined.
During his closing argument, the State's attorney said:
"That is substantially what we have. The defense presented, I believe, two witnesses. They indicated that this defendant had made statements that were recorded and defense counsel chose not to play those statements butapparently they were available. The witnesses testified both in theiron the defense's side of the case and the state's side of the case these statements were more or less the same thing he had told them orally. In fact they were not more or less, they were the same thing. He didn't vary his story on any significant point from the *261 recorded statement to the oral statement. It was the same thing."
When the closing argument was over, defense counsel, asserting that he did not wish to interrupt the State's closing argument, requested that the trial judge instruct the jury that the defendant was not required to introduce the recorded statements and that the reference in the closing argument of the State's attorney to defendant's failure to introduce the recorded statement was objectionable and should be disregarded.
The trial judge found that the objection was not timely and should have been entered when the argument became objectionable in the defense's judgment. He, moreover, refused to admonish the jury as requested, finding that the statement of the State's attorney was not a reference to defendant's failure to testify but, instead, was a comment on facts deliberately brought out by the defense itself. In addition, the trial judge was of the opinion that the subject was covered in the instructions on burden of proof which he would give in his general charge.
The ruling of the trial judge was correct under these facts and circumstances. To be objectionable a remark by the prosecutor in closing argument that the defendant failed to testify must be direct and the inference plain that the remark was designed to bring the jury's attention to such failure. State v. Howard, 262 La. 270, 263 So.2d 32 (1972). In the case at bar, the remarks objected to were a comment on a deliberate defense tactic to bring before the jury evidence that the State failed to introduce recorded confessions. It was an effort to obtain the benefit of the inference that the State's failure to introduce the recording arose from the fact that they would exculpate defendant. Under the circumstances, the comment was on the evidence and permissible. State v. Johnson, 151 La. 625, 92 So.2d 139 (1922). There is, therefore, no merit to this assignment.

Error 8
The error complained of here arises out of the refusal of the trial judge to grant a new trial upon the ground that "the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right." La. Code Crim.Proc. art. 851(5).
To support this contention, on the hearing on the motion the defendant testified that his court appointed attorney had advised him that the maximum penalty on the aggravated rape charge would be life imprisonment, and that he was not advised that the death penalty could be imposed in the case until shortly prior to the closing arguments and the judge's charge to the jury. At this time defense counsel advised him that he was "not convinced that death was the punishment." He advised the defendant that in his opinion the death penalty did not apply, but he would be sentenced to death by the trial judge if convicted, for the trial judge was of the opinion that the death penalty was mandatory if the verdict was guilty.
On voir dire examination, the State's attorney advised two prospective jurors that the death penalty was prescribed by law but actually it was no longer imposed because of a decision of the United States Supreme Court which did away with the death penalty, and if defendant were found guilty he would be sentenced to life imprisonment. No defense objection was entered to this advice.
Defense counsel also testified that plea bargaining was in progress prior to and during the trial in which the State offered to accept a plea of attempted aggravated rape. In the face of advice that a death penalty was mandatory if a guilty verdict was returned and that a plea bargain was available, this exchange took place between defendant and the State's attorney.
"Q. So actually you were discussing with Mr. Davenport (defense counsel) *262 the penalty that might be imposed was death if convicted, at that point as far as you knew any negotiations for plea bargaining was not over at that point. Is that right? (parentheses added.)
"A. Not as far as I knew but it had already gone so far that a plea bargain at that stage of the game may have been more detrimental to the case that it would have done good.
"Q. You mean you felt you might be acquitted and therefore a plea bargain wouldn't be
"A. Well, I felt like I'd rather take my chances with twelve people after that kind of evidence than I would have been just waiting for to say I'm guilty, you know, and let the judge decide it.
"Q. But you did that knowing the consequences didn't you?
"A. Well, if
"Q. Not knowing the consquences but knowing the risk that you
"A. Yes, sir."
During voir dire examination of the prospective jurors, one who was selected stated that he could serve in the case "As long as it is not the death penalty. I do not believe in capital punishment." He was accepted by the State without objection and served at the trial. His presence on the jury may have influenced the defendant's judgment. However, the verdict as finally rendered was unanimous.
In addition to the explicit refusal on defendant's part to accept the proffered plea bargain and his election to leave the decision of this case to the jury with a full awareness of the risk involved, other circumstances support the trial judge's denial of the motion for a new trial.
If this misunderstanding was indeed prejudicial and fatal to a valid prosecution, no motion for a mistrial on the ground of a legal defect in the proceedings was availed of when it was ascertained that the trial judge would instruct the jury that the death penalty was mandatory in the event of a guilty verdict. La.Code Crim.Proc. art. 775(3).
During his argument defense counsel clarified the question for the jury when he said:
"If you had been led to believe that it is punishable by life imprisonment you are mistaken. The judge will instruct you that it is punishable by death. If you find this man guilty of aggravated rape you have sentenced him or the judge will have to sentence him, no alternative, to the death penalty, death executed at the penitentiary in Angola by electrocution."
In his charge to the jury the trial judge instructed the jury, in accordance with Article 42 of the Criminal Code, that "Whoever commits the crime of aggravated rape shall be punished by death."
Both the victim and her companion who was present during almost five hours, while the offense was being perpetrated, made a positive identification of the defendant at a lineup within 48 hours of the offense. Before the lineup identification, they were able to assist in the preparation of a composite picture of him. Both positively identified him in court. The trial judge stated categorically in his per curiam that he was convinced from the evidence that the accused was guilty of the crime of aggravated rape. In his opinion the verdict was returned by fair and impartial jurors, and did not result from prejudice or injustice. In his view the evidence of guilt was overwhelming and the defendant was an intelligent individual whose election to take the case to the jury was made with full knowledge that capital punishment could be imposed.
From the record before us, it is clear that the facts are not disputed. At no time *263 during the investigatory phase of the case did defendant deny the facts. He freely disclosed what happened. Defendant's confessions and the victim's version of what occurred, according to the testimony of the victim and her companion, were almost identical on all the salient details.
In neither brief nor argument has the defense pointed out wherein prejudice occurred by reason of the impression the defendant obtained that only a sentence of life imprisonment could be imposed. No allegation is made that other evidence or additional evidence would be presented on a new trial, and there is no serious contention that the verdict is contrary to the law and the evidence.
"The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded." La.Code Crim.Proc. art. 851.
Since this record does not support the conclusion that an injustice has been done the defendant, this motion for a new trial was properly denied.
For the reasons assigned, the conviction and sentence are affirmed.
DIXON, J., concurs.
CALOGERO and BARHAM, JJ., dissent and assign reasons.
CALOGERO, Justice (dissenting).
Defendant Bryant was charged with aggravated rape; conviction on this charge mandates a sentence of death. Before and during the trial, however, defense counsel, the defendant, and the assistant district attorney prosecuting the case (and accordingly the jury as well), thought that the maximum sentence confronting the defendant was life imprisonment. Their confusion stemmed from the ruling of the United States Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed.2d 346 (1972) which held that the imposition of the death penalty in certain circumstances was unconstitutional. Our decision in State v. Selman, 300 So.2d 467 (La.1974) which upheld the mandatory death penalty for aggravated rape was not handed down until after this defendant had been tried.[1] Because of the confusion as to the penalty which could be imposed after conviction, the plea bargaining, the questioning and selection of the jury, and the three-day trial were all conducted under a misapprehension about an essential focus of the prosecution, the penalty. It was only after all of the evidence had been heard that the judge, in a conference on jury instructions, announced to the attorneys and the defendant that the sentence upon conviction would be death. The defense attorney still felt that the judge was mistaken, and so advised his client. The case was sent to the jury; defendant was found guilty and sentenced to death. Defense counsel's motion for a new trial was denied, a ruling which has now been upheld by the majority of this Court.
I respectfully dissent from that ruling. The Code of Criminal Procedure Article 851(5) provides that a new trial shall be granted whenever "[t]he court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled *264 to a new trial as a matter of strict legal right." A new trial should have been ordered here. The possible sentence upon conviction plays a crucial role, especially in a capital case, in a defendant's approach to the myriad elements inherent in defending himself in a prosecution: the bargaining, the selection of the jurors, and the conduct of the trial.
The fact that defendant was afforded an opportunity to plead guilty to attempted aggravated rape, with its lesser penalty, and chose instead to send the case to the jury, does not, in my opinion, cure the infirmity inherent in this situation. The jury had been conditioned throughout the trial to view this case as non-capital. When the jury members began their deliberations, one or more of them may well have been confused as to whether defendant was to be subjected to execution upon a finding of Guilty. Even if each of them had been able to begin thinking of the case as capital, that would not alter the fact that the trial had been conducted tactically as if it were non-capital.
It should be pointed out that the majority of this Court does not hold that the confusion as to the sentence was not prejudicial to the defendant. The majority believes that, even if the "misunderstanding was indeed prejudicial and fatal to a valid prosecution," the evidence as to defendant's guilt was "overwhelming," and an injustice had not been done the defendant. I believe, however, that where a trial has been permeated with confusion as to whether a person's life is at stake, the ends of justice would best be served by the granting of a new trial, as authorized by C.Cr.P. Art. 851. I therefore respectfully dissent.
BARHAM, Justice (dissenting).
I respectfully dissent for the reasons assigned by Mr. Justice Calogero.

ON REHEARING
TATE, Justice.
On original opinion, by a divided court, we affirmed the defendant's conviction and sentence to death for aggravated rape, La. R.S. 14:42. We granted a rehearing because of our serious concern whether a new trial should be granted in the interests of justice. La.C.Cr.P. art. 851(5).
As the original majority and dissenting opinions show, the trial was conducted until the closing stages on the mistaken assumption of both state and defense that the maximum penalty assessable was life imprisonment. This was because of the unsettled state of the law as to capital punishment following Furman v. Georgia, 408 U. S. 238, 93 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and the Louisiana legislature's 1973 reaction to it (which reinstated the death penalty, but under differing conditions with regard to different crimes). In the voir dire examination, for instance, the state accepted two prospective jurors opposed to the death penalty, instructing them that if the defendant were found guilty he would be sentenced to life imprisonment.
Nevertheless, in the closing stages of the trial, the district court concluded that the 1973 legislative revision had reinstated the death penalty for aggravated rape and that, since the legislative amendments had removed the jury's discretion to impose life imprisonment instead, a death penalty did not violate Furman. (Subsequent to the trial and verdict, this court reached the same conclusion. State v. Selman, 300 So. 2d 467 (La.1974).)
The defendant was so informed prior to the submission of the case to the jury. He elected to submit his case to the jury, rejecting a plea bargain by which he would have received a non-capital penalty.
We are unable, under the circumstances set forth in the original majority opinion, to hold that legal error was committed by thus *265 submitting the case to the jury without objection from the defendant and on his election to do so. Nor can we hold, although the issue may be close, that the trial judge abused his discretion by denying a new trial as being in the interests of justice.
Our original opinion correctly disposes of the other assignments of error urged.
For the reasons assigned, therefore, our original decree affirming the conviction and death penalty is reinstated.
Affirmed.
TATE, J., assigns additional concurring reasons.
DIXON, J., dissents.
CALOGERO, J., dissents for the reasons expressed in dissent on original hearing.
DENNIS, J., recused because of his participation in the case below.
TATE, Justice (concurring).
The writer concurs in the affirmance of the conviction. No error of law is shown, in his opinion, which justifies this court in setting aside the jury's verdict of guilty.
Nevertheless, although I am unable to secure adherence of a majority of the court, I do not feel it inappropriate to note my view that in this case the court should exercise the power granted it by the Louisiana Constitution of 1974 and declare the death penalty excessive under the facts of this case for the crime as proved.
The Louisiana Constitution of 1921 merely prohibited "cruel and unusual punishment." Article I, Section 12. In a deliberate change of working, the new Louisiana Constitution of 1974 broadened the constitutional provision (and the duty of our courts in review of sentences) by providing, Article 1, Section 20: "No law shall subject any person . . . to cruel, excessive, or unusual punishment." (Italics mine.)
The deliberate inclusion of a prohibition against "excessive" as well as "cruel and unusual" punishment adds an additional constitutional dimension to judicial imposition and review of sentences.
By the new constitution's mandate, the People have made inapplicable the prior standards of judicial review of sentences as cruel and unusual established by prior jurisprudence interpreting the former state constitutional provision, as well as jurisprudence interpreting the federal constitution's Eighth Amendment prohibition against "cruel and unusual punishments."
Two of the leading figures of the 1973 constitutional convention have correctly summarized, in my opinion, the effect of the new constitutional requirement that no sentence imposed under our criminal law be "excessive".
Professor Lee Hargrave of the LSU Law School faculty served as the co-ordinator of legal research for the Constitutional Convention of 1973; he directed research for the committee on the Bill of Rights and Elections. In discussing this provision of the new constitution, Professor Hargrave states in his article, "The Declaration of Rights of the Louisiana Constitution of 1974", 35 La.L.Rev. 1, 63 (1974):
"The prohibition against cruel or unusual punishment is derived from the eighth amendment and Article I, § 12 of the 1921 Constitution. The new section, however, adds that no law shall subject any person to `excessive punishment,' broadening the prior prohibition against `excessive fines'. This gives the courts, in the exercise of their judicial review power, a basis for determining that sentences, whether fine, imprisonment or otherwise, though not cruel or unusual, are too severe as punishment for certain conduct and thus unconstitutional. It is a basis for extending the court's control over the entire sentencing process."
*266 One of the co-authors of the Constitutional Convention's Declaration of Rights now Article I of the Louisiana Constitution of 1974, State Representative Louis "Woody" Jenkins, wrote, see "The Declaration of Rights", 21 Loy.L.Rev. 9, 39 (1975):
"The prohibition against `excessive . . . punishment' makes a great change in the law and requires the courts to do justice in each case, regardless of any legislative assertion. This standard allows the courts to avoid strained interpretations of what is cruel and unusual punishment, in order to reach the sometimes more important question of whether the punishment does, in fact, fit the crime. For example, it is much easier to find that imposition of the death penalty is excessive as punishment for such crimes as rape and kidnapping than that it is cruel or unusual. . . . Mandatory penalties are particularly suspect because they frequently have no relation to the magnitude of the offense."
The circumstances of the present case, involving young people of the same age and race, in my opinion demonstrate that capital punishment for the offender is an excessive penalty. The defendant, a mentally disturbed Vietnam veteran who had just had a violent quarrel with his wife, rode around with the two girls his own age for about five hours, during the course of which he ultimately raped one of them. There was brief penetration, but no emission or orgasm. No brutality (except for the act of rape itself) or even profanity was displayed during this long ordeal of the girls. No life was endangered in the incident, no unusual psychological trauma is shown, nor did the victim sustain psychiatric residual of any substantial nature.
No force was involved, although there was the threat of force. By reason of the threat, the jury could reasonably find that an aggravated rape had occurred. La.R.S. 14:42 (1950). The offense was obviously not a simple rape, La.R.S. 14:43 (1950)[1] the only other responsive verdict then available to the jury.
The type of offense proved is more closely described by the offense of "forcible rape", legislatively created after the present offense, La.R.S. 14:43.1, by Act 333 of 1975: "Forcible rape is sexual intercourse without the lawful consent of the female where she is presented from resisting the act by force or threats of physical violence wherein the victim reasonably believes her resistance to be useless." The penalty prescribed for this crime is imprisonment at hard labor for not less than one year nor more than twenty years. La.R.S. 14:43.1 (1975).
The 1975 amendments of La.C.Cr.P. art. 814, subd. A(8) (Act 334 of 1975) made "forcible rape" a responsive verdict to the charge of "aggravated rape", a verdict the jury in the present case would almost certainly have returned if it had been given *267 the choice. As noted, instead, "simple rape" was the only lesser verdict responsive to the charge allowed at the time of the trial.
Persuasive authority for the proposition that imposing the death penalty in cases where the rapist does not take nor endanger the life of his victim may constitute excessive punishment per se may be found in Ralph v. Warden, Maryland Penitentiary, 438 F.2d 786 (U.S.C.A. 4th Cir. 1970), cert. den. 408 U.S. 942, 92 S.Ct. 2869, 33 L.Ed.2d 766 (1972).
That court felt that the death penalty under these circumstances was so excessive as to be greatly disproportionate to the offense charged, and as such, it violated the "evolving standards of decency that mark the progress of a maturing society." 438 F.2d 786, 790, quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).
Rather than relying on the subjective opinions of the judge who imposes the sentence or of the judges who must review the case to determine the constitutionality of the death penalty in that case, the court gathered statistics of legislative actions in abolishing the death penalty, judicial actions in infrequently imposing the death penalty (when there was an option), and executive actions in the current moratorium on executing convicted capital criminals.
Statistics were also noted from around the world which indicated a similar view that the death penalty in this type of rape case is excessive. These statistics were held to be objective indicia of today's society's "evolving standards of decency." Those statistics demonstrated that presently the United States is only one of four nations in which rape is punishable by death, and only 16 of this country's 50 states provide a death penalty for rape. From 1960-1968 there were 15,560 reports of rape in the United States, yet only 101 convicted rapists during that period received the death penalty. And no one has been put to death in the United States for rape since 1964.
The ultimate penalty of death is reserved for barbarous or peculiarly cold-blooded crimes which create extraordinary risk of harm to social peace and security. Even an intentional killing of another is not under our law subject to capital punishment, La.R.S. 14:30.1 (1973), except in aggravated circumstances, La.R.S. 14:30 (1973).
For all of these reasons, under the circumstances here shown, the death penalty is excessive punishment for the offense here proved. In my opinion, this court is now under a constitutional duty to review sentences as excessive, either as for the crime charged or as disproportionate to the crime proved. While the present defendant should be subjected to severe punishment for the forcible rape he committed, the death penalty is excessive under the non-brutal circumstances of this rape, where the victim's life was not endangered nor was she subjected to serious bodily or psychological injury.
Normally, however, the excessiveness of a penalty is not a patent error discoverable from the face of the pleadings without objection at the time. State v. Williams, 332 So.2d 177 (La.1975). As that opinion indicates, the proper way to question a penalty as excessive is to object to it and to designate the error, La.C.Cr.P. arts. 841, 844 (1974); thus affording an opportunity to include evidence or circumstances, not otherwise found in the trial record, which support or defeat the contention of excessiveness.
Nevertheless, in the present case, the record itself includes the pertinent factual data as to excessiveness. Until this decision, this court has not been squarely faced with an issue of excessiveness of this nature.
This being a death penalty, the technical requirements of sufficiency to preserve an issue for appellate review should be relaxed, as they were even under the old ultra-technical bill of exceptions procedure. See State v. Square, 257 La. 743, 244 So.2d 200, 209 (1971) and the cases there cited. This *268 is especially true in the instant case, because of the novelty of the issue and of the procedure to raise it for appellate review, and the unsettled state of the law in both regards.
For these reasons, the writer's view is that, although the conviction should be affirmed, the death penalty should be set aside as excessive, and the case remanded for re-sentencing. However, since the view expressed by this opinion does not command a majority of the six justices who heard this appeal (Mr. Justice Dennis is recused) I do not in this case persist in this view; therefore, the writer presently concurs in the affirmance of the sentence as well as of the conviction, since a majority (including the writer) do agree that the conviction should be affirmed and no other majority view prevails.
NOTES
[1] During the 1973 regular session, the Louisiana legislature enacted amendments to Articles 814 and 817 of the Code of Criminal Procedure which were intended to correct the constitutional infirmities of the prior law. These amendments curtailed the power of the jury to qualify a verdict, by imposing or not imposing capital punishment, or to return any but one of the listed responsive verdicts for certain felonies, including rape. Our decision in State v. Selman, supra, held that this new scheme under which defendant Bryant was convicted, met the constitutional test of Furman v. Georgia, supra.
[1] La.R.S. 14:43 (1950) provided:

"Simple rape is a rape committed where the sexual intercourse is deemed to be without the lawful consent of the female because it is committed under any one or more of the following circumstances:
"(1) Where she is incapable of resisting or of understanding the nature of the act, by reason of stupor or abnormal condition of the mind produced by an intoxicating, narcotic or anesthetic agent, administered by or with the privity of the offender; or when she has such incapacity, by reason of a stupor or abnormal condition of mind from any cause, and the offender knew or should have known of her incapacity.
"(2) Where she submits under the belief that the person committing the act is her husband and such belief is intentionally induced by any artifice, pretense, or concealment practiced by the offender.
"(3) Where she is incapable, through unsoundness of mind, whether temporary or permanent, of understanding the nature of the act; and the offender knew or should have known of her incapacity.
"Whoever commits the crime of simple rape shall be imprisoned at hard labor for not less than one nor more than twenty years."