CLARENCE E. McMANUS, Judge.
 

 |
 
 STATEMENT OF THE CASE
 

 On March 6, 2008, a Jefferson Parish Grand Jury indicted defendant, Timothy Santini, for the second degree murder of Raymond Babin in violation of LSA-R.S. 14:30.1. On the following day, defendant was arraigned and pled not guilty to this charge. On June 2, 2008, the trial court denied defendant’s motions to suppress evidence, identification, and statement. The motion to suppress evidence was re-opened on April 13, 2009 and was again denied.
 

 
 *792
 
 Defendant proceeded to trial on December 8, 2009. The following testimony and facts were elicited at trial. On November 27, 2007, a Tuesday morning, Charles R. Lodriguez went to Missile Street to check on Raymond Babin, who was employed by Mr. Lodriguez’s cousin. Mr. Lodriguez’s cousin, Eric Hoffman, requested that he go to Mr. Babin’s residence because he had not heard from Mr. Babin for a couple of days, which was unusual. Mr. Hoffman also contacted the victim’s brother, Howard Babin, Jr., and informed him of his concern. Howard Babin also left to go check on his brother. Mr. Lodriguez arrived at the residence first. When Mr. Lodriguez arrived at the residence, the iron gate was open and the door was unlocked and partially closed. Mr. Lodri-guez opened the door and saw Mr. Babin lying on the floor in his residence. After | ¡¡calling out to him and not getting a response, Mr. Lodriguez called for an ambulance. However, the victim had a knife protruding from his neck and was dead.
 

 Colonel Timothy Scanlan of the Jefferson Parish Sheriffs Office Crime Laboratory, an expert in the field of crime scene reconstruction and bloodstain analysis, testified that there were no signs of forced entry to the residence. A kitchen drawer in the residence contained knives that appeared similar to the one found in the victim’s neck. A cordless phone, a pillow and a slipcover with bloodstains, eyeglasses, and a denture plate with bloodstains were all found near the victim’s body. It appeared the victim had been dead for some time. A newspaper, which was dated November 24, 2007, was found on the table.
 

 Howard Babin had last seen his brother for Thanksgiving. According to Howard Babin, the victim lived alone and had medical problems. He usually kept the back door unlocked during the day, but always kept the front door locked. Although he would have allowed people to use his phone, Howard Babin did not believe his brother would have given someone his credit cards or his checkbook.
 

 The victim had a gold Buick LeSabre, which he always parked in the front of his “driveway door.” According to the victim’s brother, Mr. Babin would not let others drive his vehicle. However, the victim’s vehicle was not parked in the driveway at the time the victim’s body was discovered. The victim’s daughter-in-law informed the police that the victim’s vehicle was equipped with “On-Star.” Within about ten minutes, the police said the vehicle had been located in Mississippi.
 

 While on the scene, the detectives listened to the victim’s answering machine and heard a message from Ricky Dufrene, a bank manager at Capital One. He had called on the day prior to when the victim’s body was discovered to verify [4a check that someone was trying to cash at the bank. Detective Keith Locascio of the Jefferson Parish Sheriffs Office went to the bank and spoke with Mr. Dufrene and with bank teller Ashley Pleasant. Ms. Pleasant believed the person trying to cash the check was named Tim or Timothy and was able to give a description of the individual and his clothing, which included a jacket. The bank’s corporate security emailed a still surveillance photograph of the image of the individual taken at 5:07 p.m. on November 26, 2007.
 

 Mr. Dufrene testified that he called the victim, who was a bank customer, after a teller brought him a check where the signature looked “a little off.” He explained that the signature looked like it had been traced. Ms. Pleasant testified that the check was not cashed because Mr. Dufrene did not get in touch with the customer. She gave the individual the check back, and testified that he did not appear upset.
 
 *793
 
 She was shown a photographic lineup and tentatively chose two photographs from the lineup. One of the photographs was of defendant.
 

 Lieutenant John Kramer, an investigator in Poplarville, Mississippi, was notified on November 27, 2007, that the Jefferson Parish Sheriffs Office was investigating a homicide and that a vehicle was stolen in the homicide. This vehicle was equipped with OnStar and through this satellite tracking communication technology the vehicle was located in his jurisdiction. Lieutenant Kramer went to the location at approximately 1:45 p.m. and observed the gold Buick LeSabre parked at a residence. Defendant was in the driver’s seat with the keys in the vehicle’s ignition. There were two other occupants in the vehicle — Adam Tyson and Alphonso Jones. Lieutenant Kramer conducted a “felony stop on the vehicle” and everyone was removed from the vehicle and searched. In defendant’s right, rear pants pocket, he had a Louisiana identification/driver’s license in his name and three credit cards that contained the victim’s name. All | ¡¡three individuals were arrested and brought to the Pearl River County Jail. Jefferson Parish authorities were contacted.
 

 Lieutenant Donald Meunier and Sergeant David Spera of the Jefferson Parish Sheriffs Office arrived in Mississippi at approximately 4:30 or 5:00 p.m. It was learned that three people were stopped in the vehicle and that defendant was driving. Mr. Jones and Mr. Tyson gave taped statements. After speaking with them, Lieutenant Meunier did not believe that either of them were involved in the victim’s murder. Defendant was read his rights, and he also gave a statement. Lieutenant Meunier described defendant’s demeanor as relatively quiet and agreed that he appeared calm.
 

 Defendant’s statement was played in court. In his statement, defendant admitted that he knew the victim for ten to twelve years, but denied that he was involved in the victim’s murder. He claimed that Troy Ruiz gave him the vehicle on Saturday and that the credit cards in the victim’s name were in the console of the vehicle. He said that he knew the victim as “Mr. Ray” and did not know his last name, so he did not realize the credit cards were for him. He stated that the victim never wrote him a check, and he denied trying to cash a check at the bank.
 

 Lieutenant Meunier explained that defendant said he got the vehicle from Troy Ruiz and that Mr. Ruiz was interviewed by another detective. However, after the interview, it was not believed that Mr. Ruiz was involved in the killing of the victim. After obtaining this information regarding Mr. Ruiz and receiving the photograph from the bank that he believed looked like defendant, Lieutenant Meunier returned to talk to defendant. Defendant responded that Mr. Ruiz was lying. Lieutenant Meunier testified that defendant’s demean- or changed once confronted with this information and with the photograph and he became angry and agitated, and did not want to continue the interview.
 

 1 (¡Lieutenant Meunier advised that he was charging defendant with the homicide, and the other two suspects were released. Defendant’s clothing was released after a property release form was completed at approximately 10:25 p.m. This property included a gray/black jacket and a pair of black Nike basketball shoes that defendant had on. Lieutenant Meunier recovered the victim’s credit cards and defendant’s jacket and black shoes from Lieutenant Kramer in Mississippi. There were specific items that the police were looking for in the investigation. A bloody footprint was found in the victim’s house and a surveil
 
 *794
 
 lance photograph from the bank was obtained. The photograph reflected that the suspect who tried to cash one of the victim’s checks was wearing a distinct jacket.
 

 Defendant’s girlfriend, Sherika Washington, turned over socks and pants to Lieutenant Meunier and Sergeant Spera and also gave them a statement. It was thought that defendant may have been wearing the pants at the time of the incident.
 

 Lieutenant Meunier testified that he did not leave with defendant because he had to go to Jefferson Parish to prepare an arrest warrant for defendant for Mr. Babin’s murder. Defendant remained in the custody of the Mississippi police at the time. Defendant was brought to the Jefferson Parish Correctional Center on the day after he was arrested in Mississippi. The pants and shirt defendant was wearing at the time of the arrest were also transferred with him when he was brought from Mississippi. Lieutenant Meunier had transported the jacket and shoes to Jefferson Parish and gave them to the Crime Scene Technician. The victim’s vehicle was towed from Mississippi and then searched. A single check and the victim’s checkbook were found in the vehicle.
 

 Mr. Tyson and Mr. Jones both testified that when they were arrested with defendant they believed it was for having open containers. Defendant told Mr. |7Tyson that a friend who was working offshore had let him use the car. He told Mr. Jones that the car belonged to someone working on a boat. Both denied that they had anything to do with Mr. Babin’s murder.
 

 Mr. Ruiz denied ever working offshore and testified that he never owned a gold Buick LeSabre. He testified that he followed officers to the investigation bureau and gave them a statement. He testified that he grew up with defendant and they were friends, but that in November of 2007, he had not seen defendant for a few years. He said he never went to Missile Street and denied knowing the victim.
 

 Trim Santini, defendant’s father, was the victim’s good friend and next door neighbor for approximately ten years. He testified that he had last seen the victim on Saturday, November 24th, probably around noon. Defendant had been living at his house for about two weeks prior to November 27, 2007, and before that he lived in Mississippi. Defendant’s father and mother, Deborah McCrackin, who were divorced, both testified that they went to the police station on November 27, 2007, after learning that defendant was driving Mr. Babin’s car. Defendant’s mother had talked to defendant’s girlfriend who lived in Mississippi and his girlfriend described the car that defendant was driving. The car’s description matched the victim’s car that was missing. Ms. McCrackin also testified that her son had called her a couple of times from Mr. Babin’s house and that defendant told her that Mr. Babin let him use his phone. Defendant’s father and mother both identified the person in the still photograph obtained from the bank as their son.
 

 Sherika Washington testified that she was defendant’s girlfriend at one time. She said defendant lived with her in Picayune, Mississippi and that they broke up before Thanksgiving and he left to go with his father. She recalled that defendant called her from his neighbor’s house after he was living with his father. She testified that she spoke with defendant on the Saturday after Thanksgiving and he | Rsaid he had a car that his friend was letting him use and that he was coming to Mississippi. He arrived in Mississippi on Saturday evening around 7:30 or 7:45 p.m. and stayed with her. He was in a LeSabre and said his friend who worked offshore was letting
 
 *795
 
 him use it. She said that she had defendant’s cell phone when his mother called looking for him. His mother asked her what kind of car he had come in and she told her. She also testified that defendant told her that the credit cards belonged to the same person the car belonged to. She testified that defendant left on Monday, November 26th, after saying he had to go to New Orleans to get clothes and to apply for an offshore job. She said that when the police came she gave them the sweatpants that defendant was wearing when he came to her house.
 

 Betty Studzinski testified that she lived on Missile Street and knew Trim Santini and the victim because they were her neighbors. She identified defendant in court as Trim’s son and testified that she talked to the victim’s brother at the funeral and advised him that she saw defendant outside arguing with someone over the phone about money. She then left to run errands and when she returned the victim’s car was gone and the house was dark. She said that the police later spoke with her. She explained that the victim always parked his car in the driveway. She had last seen the victim on November 24th around lunchtime. She saw the defendant on that Saturday pacing on the sidewalk, across the street between his father’s house and the other neighbor’s house (not the victim’s house). He was talking loudly on his cell phone, arguing with someone over money, and saying he would get them the money by that day. She said she returned around 6:30 or 7:30 p.m. The police showed her a photographic lineup, and she identified defendant in the lineup.
 

 Michael Haggerty, Lead Analyst with AT & T, testified regarding telephone records from the victim’s land line and cell phone records from defendant’s cell Lphone. Multiple calls were made from the victim’s phone to phone numbers with a “601” area code.
 
 [1]
 
 The last three calls made from the victim’s telephone were made on the evening of November 24, 2007, at 5:18, 5:51, and 5:53 p.m. The last numbers called were numbers that defendant had previously called multiple times according to his cell phone records.
 

 One of the victim’s credit cards was used on November 24, 2007 at 6:28 p.m. for a transaction at the Discount Zone in Terry-town. It appears the victim’s credit card was used on the following two days in Picayune, Mississippi. Defendant’s fingerprints or DNA was not found anywhere in the victim’s house. A shoe print was found in the residence. Defendant’s shoes were examined, but the print contained insufficient detail to be linked to defendant’s shoe. However, defendant’s shoes did contain the victim’s DNA. Further, the victim’s blood was found on clothing that was recovered from defendant.
 

 Pamela Williams-Cyprian, an expert in the field of forensic serology, testified that human blood was found on the Air Jordan shoes and the jacket she examined. A substance that was consistent with human blood was also found on defendant’s pants. Sarah Corrigan, an expert in the field of forensic DNA analysis, testified that the defendant’s shoes, pants, and jacket contained DNA that was consistent with the victim’s genetic profile. The expert explained that the frequency would occur in approximately one in greater than 100 billion individuals.
 

 Dr. Karen Ross, an expert in the field of forensic pathology, performed an autopsy on the victim. She explained that the time and date of defendant’s death was on No
 
 *796
 
 vember 27, 2007 at 9:59 a.m., but that this was merely the time the body was pronounced dead. She could not say an exact time of death. She believed that |10the actual time of death was prior to that due to the evidence of early decompositional change. She testified that Mr. Babin was the victim of a homicide and died as a result of a stab wound to his neck. The victim suffered from bruising on both sides of his face, the muscles on both sides of his head, both of his shoulders, and on his left upper chest. He also had rib fractures on the back left side of his body. She explained that the stab wound was singularly lethal, but the victim additionally had some bruising on his tongue and lip with some tiny hemorrhages in his right eye, which indicated asphyxia. She concluded that the stab wound was the cause of the victim’s death, but there could have been a component of blunt force injuries with traumatic asphyxia and/or suffocation. There was also bruising on the victim’s lower lip and chin. She testified that the asphyxia could be associated with the blood loss from the stab wound. However, she also testified that the asphyxia could have been from a pillow, and the wounds on the victim’s lip and chest would be consistent with that.
 

 The wound was at least three and three-quarters of an inch and grazed the victim’s spine, passing through the carotid artery. The wound almost went all the way through to the back of the victim’s neck. The knife also went through the victim’s clothing. No defensive wounds were found on the victim. Dr. Ross believed that the victim’s death was not instantaneous and would have been painful.
 

 After a four-day trial, a unanimous 12-person jury found defendant guilty as charged. On January 4, 2010, defendant filed a motion for new trial. This motion was denied on the following date. Also on January 5, 2010, defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant’s appeal follows.
 

 11,ASSIGNMENT OF ERROR NUMBER ONE
 

 Defendant argues that some evidence should have been suppressed because there was no court order issued or search warrant obtained before his clothes were examined for blood and DNA evidence. He further argues that the examination of his clothing without a warrant was illegal and not based upon exigency or any other exception to the warrant requirement. He concludes the introduction of this evidence cannot be deemed harmless, and therefore, a new trial is required.
 

 The State responds that the trial court properly denied defendant’s motion to suppress evidence because the clothing was seized after probable cause existed to believe defendant’s clothing was evidence of a particular crime.
 

 At the motion to suppress hearing on June 2, 2008, Lieutenant Kramer of the Poplarville Police Department explained that on November 27, 2007 he was notified of a stolen vehicle in his jurisdiction. He later learned that the vehicle belonged to a homicide victim. He testified that the vehicle was located and three occupants were removed from the vehicle and taken into custody. Defendant was in the driver’s seat of the vehicle. Lieutenant Kramer testified that defendant had his State identification card and three credit cards with the victim’s name in his pocket. He further testified that officers from the Jefferson Parish Sheriffs Office later arrived in Mississippi. He was advised later that night that defendant was being arrested and charged with murder.
 

 Also at this hearing, Sergeant Meunier of the Jefferson Parish Sheriffs Office tes
 
 *797
 
 tified that he advised defendant of his rights and defendant made a statement to him. Sergeant Meunier testified that he received the credit cards and the clothing defendant was wearing when he was arrested.
 

 After hearing this testimony and the testimony from other witnesses, the trial court denied the suppression motions. However, on April 13, 2009, defense 112counsel requested that the court re-open the suppression hearing as to the evidence that was seized. Defense counsel explained that there was no issue with the clothes taken by the Poplarville police and there was no problem with Lieutenant Meunier receiving the property based on signing the acknowledgement. Defense counsel argued that because the property was seized as a result of intake booking in Poplarville, the property should have been placed in defendant’s property at the Jefferson Parish Correctional Center where he was booked. Counsel explained that if this had happened then the officers would have needed a search warrant to obtain the property. Counsel added that a court order would have been required to put the property into evidence. He further argued that the examination of the shoes without a court order was inappropriate. Counsel concluded that the shoes should have been suppressed. The State responded that the officers did not need a search warrant, and alternatively, the evidence need not be suppressed because of the inevitable discovery rule. The court denied the motion to suppress, deciding that the officers did not need a search warrant. Thereafter, on April 23, 2009, a Motion to Transfer Defendant’s Property into Evidence was filed and granted.
 

 The Fourth Amendment to the United States Constitution and Article 1, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures.
 
 State v. Thomas,
 
 08-390, p. 6 (La.App. 5 Cir. 1/27/09), 8 So.3d 80, 83,
 
 writ denied,
 
 09-0626 (La.11/25/09), 22 So.3d 170. If evidence is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial.
 
 Thomas, supra.
 
 A defendant who is adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. LSA-C.Cr.P. art. 703(A).
 

 In a hearing on a motion to suppress, the defendant shall have the burden of proving the ground of his motion, except that the State shall have the burden of | isproof in establishing the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant. LSA-C.Cr.P. art. 703(D). The trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of its discretion.
 
 State v. Lee,
 
 05-2098, p. 15 (La.1/16/08), 976 So.2d 109,
 
 122, cert. denied,
 
 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008);
 
 State v. Haywood,
 
 00-1584, p. 5 (La.App. 5 Cir. 3/28/01), 783 So.2d 568, 574.
 

 The right of the police to conduct a personal effects inventory search at the time of an arrested person’s booking is a recognized exception to the search warrant requirement.
 
 State v. Wilson,
 
 467 So.2d 503, 517 (La.1985),
 
 cert. denied,
 
 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985);
 
 State v. Burns,
 
 44,937, p. 12 (La.App. 2 Cir. 2/2/10), 32 So.3d 261, 270 (citing LSA-C.Cr.P. art. 228;
 
 United States v. Edwards,
 
 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974);
 
 Wilson, supra; State v. Nuccio,
 
 454 So.2d 93 (La.1984)).
 

 However, the police may not seize any item that they choose. The item they seize must be contraband, an instrumentality of the crime, a fruit of the crime,
 
 *798
 
 or evidence of a crime.
 
 Wilson, supra
 
 at 517;
 
 Burns, supra.
 
 For the seizure of the defendant’s clothing under these circumstances to be upheld, the State must affirmatively show the existence of probable cause that the thing seized is somehow related to a particular crime. The State must establish a nexus between the item seized and criminal behavior. In the case of “mere evidence,” instead of contraband, or instrumentalities or fruits of the crime, probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.
 
 Wilson,
 
 467 So.2d at 517 (quotation omitted);
 
 Burns,
 
 44,937 at 12, 32 So.3d at 271 (quotation omitted).
 

 In
 
 United States v. Edwards,
 
 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the United States Supreme Court provided the following:
 

 [B]oth the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another placet,] and if evidence of [a] crime is discovered, it may be seized and admitted in evidence. Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial.
 

 ... With or without probable cause, the authorities were entitled at that point not only to search [the defendant’s] clothing but also to take it from him and keep it in official custody.... The police were also entitled to take from [the defendant] any evidence of the crime in his immediate possession, including his clothing.
 

 415 U.S. at 803-05, 945 S.Ct. at 1237-38 (footnotes omitted).
 

 The Court in
 
 Edwards
 
 further stated:
 

 [T]he police had lawful custody of [the defendant] and necessarily of the clothing he wore. When it became apparent that the articles of clothing were evidence of the crime for which [the defendant] was being held, the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered .... [I]t is difficult to perceive what is unreasonable about the police’s examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.
 

 415 U.S. at 806, 94 S.Ct. at 1238.
 

 In
 
 Wilson, supra
 
 at 515-17, soon after a murder, the defendant was apprehended by police officers wearing clothing that contained stains that appeared to be fresh blood. Following the defendant’s arrest, police officers instructed the defendant to remove his clothing, and the clothing was tagged by the officers and sent to the state crime laboratory. The Louisiana Supreme Court found that the seizure and retention of the defendant’s clothing was lawful and stated the following:
 

 By any standard, the detectives’ conclusion that the bloodstained clothing would eventually aid in the conviction of [the victim’s] murderer is reasonable. The defendant’s bloodstained clothing 1^potentially constituted persuasive circumstantial evidence of his involvement in the homicide. The state had probable cause to seize the clothing as evidence of criminal activity, and the police seizure and retention of such evidence without a warrant was lawful.
 

 Wilson,
 
 467 So.2d at 517.
 

 In
 
 Burns, supra,
 
 the defendant was convicted of one count of simple burglary and two counts of attempted simple burglary.
 
 Burns,
 
 44,937 at 1, 32 So.3d at 265. The
 
 *799
 
 Second Circuit found that at the time the defendant’s clothing was seized, law enforcement had lawful custody of the defendant and his clothing. Further, the court recognized that upon the defendant’s arrival at the place of detention, the police officers were entitled to search his clothing and keep it in official custody.
 
 Bums,
 
 44,937 at 14, 32 So.3d at 271. Additionally, the court found that it was apparent that the items of clothing the defendant was wearing were evidence of the crimes for which the defendant had been arrested.
 
 Burns,
 
 44,937 at 14, 32 So.3d at 271-72. The court also agreed that the police officers’ conclusion that the clothing would eventually aid in the identification of the defendant as the perpetrator of the crimes was reasonable, recognizing that the clothing worn by the person depicted on surveillance matched clothing that the defendant was wearing at the time of his arrest. Thus, the court concluded that the officers were entitled to take the items, examine them, and use them as evidence. Accordingly, the court determined the seizure and retention of the defendant’s clothing, without a warrant, was lawful.
 
 Burns,
 
 44,937 at 14, 32 So.3d at 272.
 

 In the present case, at the suppression hearing, Lieutenant Kramer testified that Sergeant Meunier advised him, after the defendant was interviewed, that the defendant was being arrested and charged with the murder. Sergeant Meunier testified that he received the clothing and credit cards from the Poplarville police 11fiwhen he went to Mississippi. The items had been taken from defendant after he was arrested in Mississippi.
 

 In determining whether the trial court’s ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing, but also may consider pertinent evidence presented at trial.
 
 State v. Mollette,
 
 08-138, p. 10 (La.App. 5 Cir. 11/25/08), 2 So.3d 461, 467,
 
 unit denied,
 
 09-155 (La.10/16/09), 19 So.3d 472 (emphasis added). The facts presented at trial appear to present further explanation as to when defendant was actually arrested for the homicide.
 

 Lieutenant Kramer testified at trial that he released the shoes and jacket that defendant was wearing when he was arrested, to Sergeant Meunier on November 27th at 10:25 p.m. just before he left. He testified that the detective advised him that he would charge defendant. Sergeant Spera testified that they received the jacket and shoes from Lieutenant Kramer, knowing that they were looking for specific items in their investigation. Sergeant Spera explained that a bloody footprint was found in the victim’s house and a surveillance photograph from the bank where the victim’s check was attempted to be cashed showed that the suspect was wearing a distinct jacket. Sergeant Meu-nier testified that he received defendant’s clothing from Lieutenant Kramer. He also explained that he did not leave that night with defendant, but instead he returned home and an arrest warrant was prepared for defendant to return to Louisiana while he remained in the custody of the Mississippi police department. Sergeant Meunier testified that no search warrant was obtained for the clothing. It was later determined that defendant’s shoes and jacket contained the victim’s DNA.
 

 As such, the testimony at trial shows that defendant was arrested in Mississippi after being found in possession of the homicide victim’s stolen vehicle. | i7However, the shoes and jacket, which were received at the time defendant was booked in Mississippi, were given to the Jefferson Parish authorities prior to defendant being arrested for the homicide.
 
 *800
 
 Nevertheless, we find jurisprudence supports the conclusion that no search warrant was necessary in the instant case.
 

 State v. Nuccio,
 
 454 So.2d 93 (La.1984), involved a situation where a defendant’s property was taken at booking for one crime and then used in another crime. In
 
 Nuccio, supra
 
 at 96-97, the defendant was convicted of armed robbery, in which the victim later died in the hospital. During the robbery, one of the men wore a reddish bandanna.
 
 Id.
 
 at 96. On the night of the robbery, the defendant was arrested for an unrelated charge of possession of marijuana.
 
 Id.
 
 at 97. At his booking for that charge, a reddish bandanna and a large quantity of coins were taken from the defendant during the booking inventory search. These items were “ ‘seized’ ” by the sheriffs office, and were not returned to the defendant upon his release from jail. Later, as a result of an unrelated shooting incident, another defendant was arrested and made a statement to the sheriffs office in which he indicated that Nuccio had committed the robbery. The defendant was arrested for armed robbery as a result.
 
 Id.
 

 On appeal, Nuccio argued that he sought to suppress the introduction of the coins and bandanna which were taken from him during his booking for possession of marijuana. He argued that the items should have been returned to him upon his release from jail, two days after his arrest, and that the items, while being held during his detention, should have been treated not as evidence seized without probable cause, but only as personal effects taken in the booking.
 
 Id.
 
 at 98.
 

 One of the arresting officers made it known at the marijuana booking that he wanted to keep the large quantity of coins and the bandanna which were taken from Nuccio as possible evidence in the robbery. This arresting officer testified hsthat the sheriffs office did not consider Nuccio to be a suspect in the robbery, nor did they have probable cause for his arrest in connection with that crime. It was only after another defendant in an unrelated crime made his statement that the police had such probable cause. The court cited
 
 State v. Bryant,
 
 325 So.2d 255, 257-59 (La.1975), for the proposition that once a person has been “lawfully deprived of the possession of ... [his property], and the custody and control of ... [the] objeet[s] was legitimately under the dominion of the police, it was not an unreasonable search and seizure for the police to use it as evidence of another crime.”
 
 Id.
 
 at 259.
 

 The Louisiana Supreme Court noted that the propriety of the seizure of the coins and bandanna, then, could be upheld if they constitute “evidence” of the armed robbery or some other crime. The court further noted that the seizure of property must be supported by a finding that the thing probably will lead to an arrest or conviction of a person for a particular crime. It concluded that the bandanna, and alleged fruits of the crime, the large quantity of coins, were seized from Nuccio at his marijuana booking at which time the police already had a version of what had happened at the robbery: a man wearing a reddish bandanna stole some money, which probably contained a large amount of loose change. The court further concluded that it was reasonable for the police officer to conclude that, while he could not be certain that Nuccio was one of the armed robbers, there was a possibility that the bandanna and the unusually large quantity of coins would eventually lead to an apprehension or conviction of some person. In
 
 Nuccio,
 
 the court explained that the evidence alone was too circumstantial to support a finding of probable cause to arrest Nuccio, but there was probable cause for the police to believe that the items eventu
 
 *801
 
 ally would lead to an arrest or conviction. Thus, the |1flcourt concluded that the coins and the bandanna were not seized and retained unlawfully.
 

 The present case differs slightly from
 
 Nuccio
 
 because this case involved two different police departments, whereas
 
 Nuccio
 
 appeared to involve the same police department. However, in the present case, defendant does not challenge on appeal the transfer of the property from Mississippi authorities to the Jefferson Parish authorities. In fact, counsel conceded at the suppression hearing that this transfer was not an issue. Instead, defendant only challenges on appeal the testing done on the clothing -without a search warrant, arguing that the trial court erred by not suppressing unauthorized DNA and blood evidence. However, we find that case law, as discussed above, suggests otherwise.
 

 In this present case, the officers knew of a bloody footprint found in the victim’s residence and had a photograph from the bank of the person who tried to cash the victim’s check on the day before his body was discovered. The person in the photograph was wearing a jacket. With this knowledge, we find it was reasonable that the officers were interested in obtaining defendant’s shoes and jacket. We find the officers also had the authority to examine defendant’s shoes and jacket without a search warrant. As such, we find the trial court did not abuse its discretion in denying defendant’s motion to suppress.
 

 ERROR PATENT DISCUSSION
 

 The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 387 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). We note no errors which require corrective action.
 

 Accordingly, defendant’s conviction and sentence are affirmed.
 

 AFFIRMED
 

 [1]
 

 . Ms. Washington, who lived in Mississippi, testified as to phone numbers belonging to her family, which all included the “601” area code.