467 So.2d 503 (1985)
STATE of Louisiana
v.
David Earl WILSON.
No. 84-KA-1572.
Supreme Court of Louisiana.
February 26, 1985.
Rehearing Denied May 2, 1985.
Concurring Opinion May 8, 1985.
*507 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Walter P. Reed, Dist. Atty., Margaret Coon, Thomas Mull, David Paddison, Asst. Dist. Attys., for plaintiff-appellee.
S. Austin McElroy, Covington, for defendant-appellant.
BLANCHE, Justice.
Defendants, David Earl Wilson, a.k.a. David Thomas, Larry Benjamin and Larry Darnell Taylor were indicted by the St. Tammany Parish Grand Jury for the first degree murder of Stephen Stinson, a violation of La.R.S. 14:30. The defendants were separately arraigned and each entered a plea of not guilty. After a motion to sever was granted, the defendant was brought to trial and a jury of twelve unanimously found him guilty of the crime as charged. Following a sentencing hearing, the jury also unanimously recommended that the defendant be put to death, and the trial court sentenced him accordingly. In reaching its conclusion, the jury found the existence of three statutory aggravating circumstances: (1) the defendant had been engaged in the perpetration or attempted perpetration of an armed robbery at the time the victim was killed; (2) the offense was committed in an especially heinous, atrocious, or cruel manner; and (3) the defendant has a significant prior history of criminal activity. La.C.Cr.P. art. 905.4 §§ (a), (c) and (g).
In appealing his conviction and sentence, the defendant has assigned thirteen errors, eight of which were not briefed.[1] In this opinion we will treat five assignments of error (assignments 1, 5, 7, 8 and 9) and review the sentence. The defendant's remaining assignments involve legal issues governed by established principles of law and will be treated in an unpublished appendix which will comprise part of the official record in this case. Our review will show that none of the assignments warrant reversal and we will therefore affirm the conviction and sentence.

FACTS
Other than the defendant's own testimony, Larry Benjamin provided the only direct evidence of the events leading up to the shooting of Stephen Stinson.[2] The three men had apparently just met in Houston, Texas, where they were all living. Subsequent events found the three driving *508 to Mobile, Alabama in Taylor's brown Oldsmobile 88. After spending about a week there they departed Mobile and drove Westbound on I-10. Shortly after midnight, the Oldsmobile driven by Taylor ran out of gasoline south of Slidell on I-10 approximately one mile west of Old Spanish Trail (Louisiana Highway 433). At the time, Larry Taylor was driving while Larry Benjamin was in the front seat and David Wilson was in the back seat. Taylor got out of the car and went into the trunk to get an antifreeze jug to use in flagging down some help. About the same time, the defendant told Benjamin "[w]ell, I will get you some gas." In response to this remark, Benjamin stated that he hoped the defendant would not "do anything drastic" to which defendant replied, "I [don't] give a _______ about killing the ______ ________." Wilson then exited the back seat carrying a sawed-off shotgun and hid in the tall wet uncut grass several feet from the road's shoulder.[3] Soon, Stephen Stinson[4] spotted the motorists in need of assistance and he stopped his Volkswagen Rabbit immediately in front of Taylor's Oldsmobile. After a short conversation with Taylor, Stinson agreed to take him to a gas station.[5] As Taylor walked around the car and opened the Volkswagen's passenger door, the defendant emerged from his hiding place and pushed Taylor away from the door. Wilson then shoved the single shot sawed-off shotgun into Stinson's face and fired point blank.[6] Stinson's automobile, which was in gear and running, roared, lurched forward and came to rest abruptly when it smashed into a pine tree approximately 200 feet from Taylor's automobile. As the defendant chased the Volkswagen down the shoulder of the highway, Larry Taylor went back to the Oldsmobile and informed Benjamin that Wilson had "killed a man". Taylor and Benjamin then hurriedly ran from the scene of the homicide without having followed the defendant to Stinson's automobile.[7]
Two passing truck drivers apparently observed the automobile wedged against the pine tree and alerted the police over their citizen's band radio. In response thereto, Deputy Spears of the St. Tammany Sheriff's Department was one of the first on the scene. He was talking with the two truckers when Deputy Jerry Willard arrived. The truck drivers explained that they had seen two black males running from the area. The police officers went down to Mr. Stinson's car and found his body laying outside of the car with his right foot inside the car propped lifelessly on the floorboard of the driver's side of the car. A sawed-off single barrel Revelation twelve gauge shotgun with a live shell in its chamber was found underneath the victim's body. In the meantime, Freddy Drennan, Chief of Detectives with the St. Tammany *509 Sheriff's office, was alerted and he assigned detectives Mike Moore and Edward Baroni to the case. All three were on their way to the site at this point.
Deputy Willard got back in his automobile and headed eastbound on I-10 looking for the people that had been spotted running away. Within a mile or a mile and a half, he saw the defendant hitchhiking in front of the 84 Lumber on the eastbound lane of the interstate. He then stopped the defendant and asked for his identification. The defendant dressed in a three piece grey suit, fumbled through his jacket trying to locate an ID. When he pulled his sport coat open, Deputy Willard noticed moist spots on his vest and coat lining that appeared to be fresh blood. The defendant was immediately placed under arrest, and informed of his Miranda rights. The defendant identified himself as David Thomas and informed the officer that the stains were blood which appeared on the suit after he had loaned it to his brother one month earlier.[8] Willard handcuffed him after a cursory pat-down check for weapons. The defendant was then transported back to the murder scene which by that time had been secured by Chief Detective Drennan.
Investigating officers photographed and conducted a thorough search of the interior of Mr. Stinson's automobile. A crime scene technician recovered fifteen lead pellets ("shot") from the driver's compartment and a small piece of plastic ("wadding") from the driver's seat. No prints on the gun and no positive prints on Mr. Stinson's automobile were found. Neither the "antifreeze jug" allegedly removed from the Oldsmobile's trunk by Taylor nor a spent shotgun shell were recovered from the scene.
Chief Drennan again read defendant his Miranda rights and further questioned him concerning the crime.[9] Drennan then performed a more complete search of defendant and removed a live 12 gauge Remington Peters shotgun shell from defendant's right front pants pocket. Drennan observed that defendant's suit pants were wet from the knees down.
Soon thereafter, Larry Benjamin and Larry Taylor were apprehended by Sheriff's deputies in a mobile home sales lot about one mile from the murder scene. According to the testimony given by Larry Benjamin, he and Taylor were walking back toward the car "to put our hands in the good Lord's and let him take care of it, and before we could tell them what had happened, we were in custody." At the time of their arrest, neither Taylor or Benjamin possessed shotgun shells, shoulder holsters or weapons of any type. No blood was observed on the clothing of either of the two men.[10]
All three suspects were subsequently transported to the St. Tammany Parish Sheriff's office. Defendant's clothes were removed and each article was tagged by Detective Frey in the presence of Detective Baroni. Defendant also executed a statement for the officer in charge of bookings, that he was not injured during the arrest. Defendant also executed a waiver of rights form and made a taped statement in the *510 presence of Detectives Moore and Baroni. In addition to defendant's execution of the waiver of rights form he was read his Miranda rights again.[11] The officers read him his rights a third time which was recorded on tape prior to his confession.
Both of these documents were executed by the defendant by printing an encircled "X" thereon. This was due to the fact that he had informed the police officers that he could neither read nor write.
Defendant, Benjamin, and Taylor were then transported to Slidell Memorial Hospital where blood samples were obtained from each. The defendant had also signed the consent form to have blood drawn with an encircled "X".
An autopsy was performed on the body of Stephen Stinson. The victim's wounds were confined to the head and upper part of the neck. Over 200 pellets were removed from this area. The left side of Stinson's face and many of his teeth were blown away. All major blood vessels of the upper neck were destroyed including the carotid artery. The cause of death was stated as follows: 1) hemorrhaging around the brain stem, and 2) clogging of the windpipe with blood ("obstructed airway response").
Results of tests conducted by a forensic serologist indicated that the substance on defendant's shirt and suit jacket lining was blood of the same type as Stephen Stinson.[12] No blood was found on either Benjamin or Taylor's clothing and shoes. The shotgun shell removed from the gun found underneath the victim's body had a minute amount of human blood on it of an indeterminable type.
The Revelation sawed-off 12 gauge shotgun was found to be operable. The small piece of plastic removed from the driver's seat of Stinson's Volkswagen was identified as a "part of a power piston similar to that used in Remington shotgun shells." An expert in firearms examination, opined that this evidence could have come from a shotgun shell actually fired by the Revelation shotgun found underneath the victim's body. The pellets removed from Stephen Stinson's face and automobile were of a size similar to that found in the shell removed from defendant's pocket and to those employed in a Revelation brand shotgun.[13] *511 These findings supported his conclusion that Stinson was shot at close range with a shotgun of the type found underneath his body.[14]
Defendant testified at trial against the advice of counsel. During direct examination, defendant acknowledged prior convictions for burglary, attempted robbery and petty theft. He claimed that none of these crimes involved acts of violence and stated that he had been incarcerated only once, for a period of sixteen months. Defendant testified that he is capable of effecting a written signature and denied executing any waiver forms with an encircled "X." Defendant further denied making any statements to law enforcement officials.
Defendant claimed that he was beaten by law enforcement officials at the crime scene and at Slidell Police Headquarters because he refused to make a statement. However, two days after his arrest, Dr. Russell Roberts performed an extensive examination of defendant pursuant to an order of the district court. No bruising, swelling, contusions or any other evidence of the infliction of a physical beating was discovered. In addition, each of the state's witnesses was cross examined by defense counsel to ascertain whether or not they hit, intimidated or coerced the defendant at anytime in order to induce a statement or any other type of cooperation. The response to those questions was always negative. Defendant's pre-trial Motion to Suppress Inculpatory Statements was denied after a full evidentiary hearing.
Defendant denied any knowledge of an involvement in the robbery and murder of Stephen Stinson. He claimed to have been asleep in the Oldsmobile during the incident, only to awake to the sight of police units and eighteen wheel trucks. Apparently unimpeded by police, defendant walked away from the scene because his unauthorized absence from California constituted a violation of parole and he "didn't need no more hassle or trouble from anybody." After his arrest, defendant was transported to the murder scene and allegedly forced to remove his green three-piece suit as he stood by the highway shoulder. Wilson denied ownership of the bloodstained grey three-piece suit introduced at trial.
On nearly every material point, defendant's testimony contradicted that of prosecution witnesses. The jury could have reasonably disbelieved defendant's testimony as the following developments which occurred during cross-examination considerably undermined his credibility: In contradiction to representations made on direct, defendant admitted that his three convictions were for grand larceny, second-degree robbery and second-degree burglary, and that, in fact, he had served two prison terms. Defendant repeatedly refused to answer the prosecution's questions under threat of the imposition of contempt penalties. A review of the transcript supports a characterization of defendant's demeanor on the stand as argumentative and evasive. The veracity of defendant's claim of a police frame-up was likely reduced by his admission that he did not like the police.

Assignment of Error Nos. 1 and 5
By this assignment, defendant contends the trial court erred in denying his motion for a change of venue and in denying his motion for individual voir dire. In brief, he claims that extensive pre-trial publicity identified him as the "triggerman" who had in their words "confessed." To the contrary he contends that his confession was nothing more than an exculpatory statement. He also complains to have been prejudiced by the media emphasizing the prominent status of the victim, an announced candidate for the St. Tammany Police Jury. Additionally, since the defendant *512 was from Houston, he was cast as an "out of towner" who had murdered a local political candidate. He argues that from all of this a presumption of juror prejudice was created which mandated a change of venue.
A motion for a change of venue is governed by La.C.Cr.P. arts. 621, et seq. La. C.Cr.P. art. 622 states the grounds for the granting of such motions, and provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of withesses at the trial.
In urging a change of venue for his trial, an accused must establish that there exists such prejudice in the collective mind of the community that a fair trial is impossible. The defendant must show more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. Whether such a showing has been made is a question addressed to the trial court's sound discretion, which will not be disturbed on appeal absent an affirmative showing of error and abuse of that discretion. State v. Vaccaro, 411 So.2d 415, 424 (La.1982); State v. Adams, 394 So.2d 1204 (La.1981). In reviewing a denial of a motion for a change of venue, this Court will make an "independent evaluation of the facts to determine whether the accused received a fair trial, unfettered by outside influences." State v. Willie, 410 So.2d 1019, 1024 (La.1982); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).
The change of venue concept should operate where the state of the public mind against the defendant is such that jurors will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly.
In State v. Bell, 315 So.2d 307 (La. 1975) this court discussed those relevant factors which should be considered when determining the propriety of granting defendant's request for a change of venue. Such considerations include (1) nature of pre-trial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and, (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
In this particular case, the trial court deferred action on the motion until after voir dire. Potential jurors were strenuously questioned by each side concerning their exposure to pre-trial publicity and their ability to decide the case impartially based solely on the evidence adduced at trial. Thirty-nine prospective jurors were interviewed before a 12-member jury and one alternate were selected. Of these, 24 admitted exposure to some degree of pre-trial publicity. Five panel members questioned indicated possessing only a vague, undetailed recall of what they had read or viewed. Seven panel members had not heard or read anything regarding this incident. Nine potential jurors were excused for cause for reasons unrelated to pre-trial publicity without having been questioned in this regard. One panel member was peremptorily excused by the state without having individually responded to publicity-related questions. In making an independent evaluation of the facts, the record demonstrates that both counsel for the defendant and the state conducted a thorough voir dire of the prospective jurors.
*513 There is no doubt the publicity surrounding the incident and the defendant's trial was extensive, and that to some extent, public officials participated in the initial dissemination of that publicity. However, without regard to whether a presumption of prejudice should be found under the circumstances, it is submitted that the district court's denial of the motion to change venue was correct insofar as the impartiality of a jury is ascertainable from individual responses during voir dire. Although a majority of the prospective jurors (i.e. 24 of 39), admitted exposure to pretrial publicity, only four were excused for cause on grounds of their formation of a fixed opinion based upon this publicity. A review of the responses of the potential jurors on voir dire does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors.
In support of his position that the candid assurances of the jurors during voir dire were not dispositive of the issue in this instance because a presumption of prejudice existed, defendant introduced eleven packets of newspaper articles, videotapes and radio transcripts. The defendant does not point specifically to any one of these pieces as the major source of prejudice but introduces all media reporting of the event as cumulative evidence supporting his argument. These exhibits included fifty-eight separate news broadcasts or print reports. The great majority of the reports (38 of 59) was published or broadcast within one week of the murder of Stephen Stinson and more than five months before trial. The accounts of the murder are accurately characterized as "straight news" reporting; however, seven of the reports incorrectly stated that defendant had admitted in his taped statement that he shot Stephen Stinson.[15]
It is the opinion of this court that the record in this case does not justify a presumption that the defendant would not obtain a fair trial because of a trial atmosphere utterly corrupted by press coverage. The nature of the publicity in this case was not inflammatory or prejudicial but mainly involved factual accounts. The degree of circulation was admittedly widespread, although some jurors did testify they heard nothing of the event. The news reports containing detailed accounts of the homicide were limited to publications appearing only a few days after the perpetration of the crime. In considering whether the defendant demonstrated an abuse of discretion in the trial court's ruling denying the requested venue change, we have tested the evidence adduced at the hearing on the Motion for Change of Venue, and the testimony of the prospective jurors on voir dire against the particular factors in Bell, supra. We are unable to conclude that the trial court's refusal to grant defendant's Motion for Change of Venue amounted to an abuse of discretion. It cannot be said that the publicity was of such a character that a juror exposed to it should have been presumed prejudiced regardless of whether after rigorous investigation he indicated that he could remain impartial.
In brief, defendant further notes the district court did not follow the American Bar Association's standards relating to fair trial and free press which suggest that the jurors should be questioned outside the presence of other jurors. Defendant's motion for individual voir dire (sequestration) is understood to be a request for the individual examination of each juror out of the presence of the others.
*514 Both parties were allowed individual questioning of panel members, but not out of the presence of the others. The defendant has the burden to show that the court abused its discretion in refusing to sequester the venire during voir dire. State v. David, 425 So.2d 1241 (La.1983). State v. Willie, supra; State v. Monroe, 397 So.2d 1258 (La.1981). Potential jurors were questioned in groups of six. Three of the first six veniremen questioned were excused for cause because of partiality resulting from exposure to publicity. Thereafter, only one juror was excused for cause on these grounds although an additional 33 jurors were interviewed. It is conceivable that the reduction in number of successful cause challenges owing to media exposure which occurred as voir dire progressed resulted from the fashioning by jurors of what were perceived by them to be proper responses; however, this is mere conjecture unsupported by the record. In any event, the district court's failure to follow A.B.A. proposed standards does not establish an abuse of discretion. There is no provision in our law which either prohibits or requires the sequestration of prospective jurors for an individual voir dire. State v. Kirkpatrick, 443 So.2d 546 (La.1984). We do not wish to hypothetically propose a situation when sequestration might be necessary. It is enough to say that it was not required in this case and is not enough that other potential jurors would hear answers given in response to interrogations to support a finding of prejudice. The responses on voir dire in this particular case certainly appeared to have been a fair and honest reflection of impartiality not tainted in the least by a failure on the court's part to require each potential juror to be questioned in private. Therefore, these assignments of error are without merit.

Assignment of Error No. 7
By this assignment, defendant contends that the district court erred in excusing potential juror Russell Frederick for cause. During voir dire, Mr. Frederick stated that he would have problems with the witness for the state, Larry Benjamin, not because he was a female impersonator, but because in particular, he would not believe the witness because the witness may be "copping for the lesser". He ventured that he would have trouble believing the witness and that it could affect his decision in the case. After the judge properly instructed him that he should treat this witness as every other witness in the case, Frederick replied that he would try very hard"but the veracityI have trouble with that." The trial court is vested with broad discretion in ruling on challenges for cause and its rulings will not be disturbed absent a showing of an abuse of discretion. State v. Benoit, 440 So.2d 129 (La.1983); State v. Smith, 437 So.2d 802 (La.1983). The voir dire of Mr. Frederick does not reflect an unequivocal refusal on his part to believe Larry Benjamin's testimony; however, a review of his "total performance" on voir dire arguably supports a conclusion that it would be difficult, if not impossible for him to be impartial concerning the witness's testimony because of his preconceived feeling concerning the witness's interest in testifying. State v. Nicholson, 437 So.2d 849 (La.1983); La.C. Cr.P. art. 797(2) and (4).[16]
Moreover, assuming the district court erroneously allowed the state this challenge for cause, defendant is not afforded a ground for complaint, unless the effect of the ruling is the exercise by the state of more peremptroy challenges than it is entitled by law. La.C.Cr.P. art. 800; State v. James, 431 So.2d 399 (La.1983); *515 State v. Edwards, 406 So.2d 1331 (La. 1981). The state has eight peremptory challenges in first-degree murder trials. La.C.Cr.P. art. 799. A review of the voir dire proceedings indicates that the state exercised only two peremptory challenges. Defendant does not contest any of the ten (10) other challenges for cause granted by the district court. Should this Court determine that the district court erred in dismissing prospective juror Frederick for cause, defendant would not be entitled to relief as the district court's ruling did not produce the statutorily prohibited effect of granting the state more challenges than it was entitled to by law.[17]

Assignment of Error No. 8
By this assignment, defendant contends that the trial court erred in denying defendant's motion to suppress the evidence. The defendant contests the validity of the arrest and subsequent search which resulted in the seizure of physical evidence and the elicitation of statements from defendant. Defendant specifically alleges that the arrest and search were illegally effected without probable cause or warrant.
Probable cause to arrest exists when the facts and circumstances known to the officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing the person to be arrested has committed a crime. State v. Talbert, 449 So.2d 446 (La.1984); State v. Smith, 433 So.2d 688 (La.1983).
The following facts were known to St. Tammany Parish Deputy Sheriff Jerry Willard prior to his arrest of defendant. At 1:17 a.m. on October 17, 1983, a St. Tammany Parish sheriff's call, which had been received from Louisiana State Police Troop L, was transmitted alerting all units of the suspected homicide. At the murder scene, the professional truck drivers informed Willard that two black males were observed leaving the scene. Mr. Stinson's bloodied body was observed hanging out of his automobile, face up with one leg resting on the floorboard. A great deal of blood was splattered throughout the interior of his automobile. Within moments after Willard's discussion with the truck drivers, he got back into his squad car and headed easterly in search of those who had been seen fleeing. Less than thirty-two minutes after the radio call was issued and about one mile down I-10, Willard spotted the defendant hitchhiking. Deputy Willard stopped and requested identification from defendant. The initial stop was clearly reasonable given the defendant's race, and the physical and temporal proximity of the site of the stop to the murder scene. La.C. Cr.P. Art. 215.1.[18] When the defendant opened his suit jacket to look for identification, *516 Deputy Willard observed blood "smears" on the lining of defendant's suit coat and "splatter spots" on his vest. The deputy sheriff concluded that these were fresh bloodstains and placed defendant under arrest. The arrest was justified because the time and location of the initial police encounter, the presence of fresh bloodstains on the defendant's clothing and the defendant's race all rendered justifiable Deputy Willard's belief that Wilson was involved in the homicide under investigation. La.C.Cr.P. Art. 213(3).[19] Therefore, we hold that Willard had probable cause to detain, arrest and frisk the defendant.
After the arrest, Deputy Willard immediately read Wilson his Miranda rights which defendant indicated he understood. A fruitless pat-down search for weapons was conducted. Defendant made two statements to Deputy Willard prior to being taken back to the murder scene: 1) the defendant stated that the red stains were, in fact, one week old blood-stains which appeared on his suit after he had loaned it to his brother[20] and 2) he informed Willard that two black males wearing shoulder holsters and women's facial cosmetics ran past him while he was hitchhiking. No evidence was adduced suggesting that these statements were anything but freely and voluntarily made. Nor does the record present any reason to disbelieve Deputy Willard's contention that he made no effort to threaten, coerce, or intimidate defendant prior to these statements.
At the murder scene, Chief of Detectives Freddie Drennan again read defendant his Miranda rights. The defendant again communicated his comprehension of these rights. During the course of the questioning by Detective Drennan, defendant indicated his eagerness to cooperate and eventually admitted that "I was here, but I didn't have anything to do with it." No evidence was adduced at the suppression hearing indicating that these statements were not freely and voluntarily given. Similarly, no evidence was adduced supporting defendant's claim, made at trial that he was threatened with lynching and was punched in the chest and abdomen in order to get him to talk.[21]
*517 After having read the defendant his Miranda rights, Detective Drennan then conducted a thorough search of the defendant because the defendant was to be transported back to the police station in a squad car that was not equipped with a "cage". The search resulted in the seizure of a Remington Peters 12 gauge shotgun shell retrieved from Wilson's right front pants pocket.
A search performed incident to lawful arrest has long been recognized as an exception to the warrant requirement. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); State v. Ruffin, 448 So.2d 1274 (La.1984); State v. Tomasette, 381 So.2d 420 (La.1980). To validate a warrantless search under this exception, the state is required to affirmatively show that probable cause to arrest existed. State v. Buckley, 426 So.2d 103 (La.1983); State v. Zielman, 384 So. 359 (La.1980). The State has carried its burden of proving that Deputy Willard had probable cause to arrest David Earl Wilson for murder. Accordingly, the shotgun shell seized from defendant's pocket was the product of a lawful search incident to arrest. Defendant was subsequently transported to the sheriff's office where he was booked. He again had his Miranda rights read to him. At this point, the defendant informed the officer that he could not read nor write. As a result the officers were cautious to make sure the defendant comprehended his rights. He indicated that he did in fact understand. A taped inculpatory statement was then taken by Detectives Mike Moore and Edward Baroni. Prior to anything being said by the defendant, he was again asked, this time on tape, whether he understood his Miranda rights. He again answered affirmatively. At the completion of the statement, the defendant removed his clothing on the detectives instructions. Sargeant Frey tagged each piece of clothing with his initials while Detective Baroni watched. The clothes were then sent to the State crime laboratory in Baton Rouge.
The right of the police to conduct a personal effects inventory search at the time of an arrested person's booking is a recognized exception to the search warrant requirement. La.C.Cr.P. art. 228. United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); State v. Nuccio, 454 So.2d 93 (La.1984). The police may not, however, seize any item that they choose. The item seized must be contraband, an instrumentality of the crime, C.Cr.P. art. 161(2), a fruit of the crime, C.Cr.P. art. 161(1), or, since Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), evidence of a crime. In order for the seizure of defendant's clothing under these circumstances to be upheld, the state must affirmatively show the existence of probable cause that the thing seized is somehow related to a particular crime. Nuccio, supra, at 99. The state must establish a nexus between the item seized and criminal behavior. "Thus, in the case of `mere evidence', probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." Hayden, supra, 387 U.S. at 307, 87 S.Ct. at 1650. By any standard, the detectives' conclusion that the bloodstained clothing would eventually aid in the conviction of Stephen Stinson's murderer is reasonable. The defendant's bloodstained clothing potentially constituted persuasive circumstantial evidence of his involvement in the homicide. The state had probable cause to seize the clothing as evidence of criminal activity, and the police seizure and retention of such evidence without warrant was lawful.
Thereafter, the detectives asked defendant if he would consent to the removal of a blood sample from him. As a result of the defendant's so-called illiteracy, Detective Baroni carefully read and explained to defendant the contents of a consent form and a waiver of rights form permitting hospital personnel to remove blood without a search warrant. Detective Moore informed defendant that the blood was to be withdrawn as part of the murder investigation "for an alcohol and drug scan on his blood *518 and also a type." He executed the form, as he did on the form consenting to giving his taped confession, by entering an encircled "X". Both detectives witnessed defendant's signature with their initials.
A search conducted with the subject's consent is a specifically established exception to both the warrant and probable cause requirements. State v. Owen, 453 So.2d 1202 (La.1984); State v. Edwards, 434 So.2d 395 (La.1983). When the state seeks to rely upon consent to justify a warrantless search, it must demonstrate that the consent was freely and voluntarily given without coercion. State v. Clark, 446 So.2d 293 (La.1984); State v. Yarbrough, 418 So.2d 503 (La.1982). The voluntariness of defendant's consent to search is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case and the trial court's determinations as to the credibility of witnesses is to be accorded great weight on appeal. State v. Edwards, supra; State v. Smith, 433 So.2d 688 (La.1983); State v. Yarbrough, supra.
A review of the present record supports the district court's conclusion that defendant freely and voluntarily consented to the withdrawal of the blood sample. No basis for disbelieving the detectives' testimony was produced on either day of the suppression hearing. Furthermore, a medical examination of defendant only two days after his consent was obtained, produced no evidence even remotely suggesting the employment of physical coercion by investigating officers.[22] It is evident that the withdrawal of defendant's blood for testing and typing was accomplished pursuant to a lawful consensual search. Therefore, this assignment of error is without merit.

Assignment of Error No. 9
By this assignment, defendant contends that the district court erred in denying defendant's motion to suppress the confession. The defendant specifically alleges that the state did not prove beyond a reasonable doubt that his waiver of his Miranda rights was free and voluntary. The defendant also cites as reversible error, the state's failure to specifically rebut his detailed allegations of police misconduct (i.e., physical beatings and threats) in securing his taped confession.
Before the state may introduce a confession into evidence, it bears a considerable burden of proving affirmatively that the statement was made freely and voluntarily and not under the influence of threats, promises, coercion, physical abuse or intimidation. R.S. 15:451; C.Cr.P. art. 703(D). State v. Nuccio, supra; State v. Vessell, 450 So.2d 938 (La.1984). As part of this burden the state must specifically rebut defendant's detailed allegations of police misconduct in procuring the statement. State v. Wilms, 449 So.2d 442 (La. 1984); State v. Neslo, 433 So.2d 73 (La. 1983).
Defendant was advised of his Miranda rights by Deputy Willard and Chief of Detectives Drennan on separate occasions prior to his transportation to police headquarters. The defendant indicated to each officer that he understood these rights and was willing to cooperate.
At the police station, the defendant repeatedly had his rights read to him by police officers and he subsequently indicated his understanding of those rights. He then executed a written waiver by affixing his mark in front of witnesses. Detectives Moore and Baroni then conducted a taped interview of defendant, the first part of which consisted of a repetition of defendant's Miranda rights and an acknowledged affirmative waiver of those rights by defendant.
*519 Officers Willard, Moore and Drennan each testified that defendant was not beaten, abused or intimidated by them or in their presence. They further testified that there were no promises or inducements offered to the defendant.
Defendant's taped statement was played and introduced at trial during the examination of Detective Moore. A predicate for the voluntariness of the statement was laid prior to its use at trial. Specific allegations of police misconduct were not advanced by the defense until defendant testified, wherein he denied making a statement and declared the taped voice to be that of another person. This occurred more than one month after the district court found the confession freely and voluntarily given at the close of the February 10, 1984 suppression hearing, and after the statement had already been played to and the transcript read by the jury. Regardless of the untimeliness of the allegations, Officer Moore, Baroni and Willard specifically refuted them when called on rebuttal by the state. The district court's ruling that defendant's confession was freely and voluntarily given was correct.
The defendant further claims that his functional illiteracy precluded a knowing and intelligent waiver. A diminished intellectual capacity does not alone vitiate a defendant's ability to make a knowing and intelligent waiver of Miranda rights and confess voluntarily; the critical factor is whether defendant was able to understand the rights as explained to him and voluntarily give a statement. State v. Benoit, 440 So.2d 129 (La.1983); State v. Lindsey, 404 So.2d 466 (La.1981). Defendant repeatedly indicated to investigating officers that he understood his rights.
The district court's determination that his taped statement was free and voluntary is entitled to great weight and will not be disturbed unless it is not supported by the evidence. State v. Benoit, supra; State v. Williams, 383 So.2d 369 (La.1980). The district court's ruling is supported by considerable evidence. Accordingly, this assignment of error is without merit.

Capital Sentence Review
The defendant was tried in accordance with the provisions of La.C.Cr.P. arts. 905-905.8, which provide for a bifurcated hearing, the 12-man jury returned a unanimous recommendation that the defendant be sentenced to death.
Article 905.9 of the Code of Criminal Procedure requires this court to review every sentence of death to determine whether or not it is unconstitutionally excessive. In making this inquiry, we are guided by Supreme Court Rule 28 § 1 and must consider whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, whether the evidence supports the finding with respect to aggravating circumstances, and whether the sentence is disproportionate to others imposed in similar cases. This is done by considering both the crime(s) and the defendant. State v. Celestine, 443 So.2d 1091 (La.1983).
The Uniform Capital Sentence Report (UCSR) reveals this 29 year-old black male has three prior felony convictions and a significant record of prior arrests.[23] The Post-Sentence Investigation report (PSI) indicates that the defendant is one of sixteen children born to the marriage of Mit and Matlie Wilson. Defendant's education stopped at kindergarten. Neither the UCSR prepared under the direction of district court Judge Thomas Tanner, nor the PSI prepared by the Louisiana Department of Corrections contain any further background information or diagnostic test results *520 concerning Mr. Wilson. The UCSR noted that the Department of Corrections attempted to interview the defendant; however, he became very hostile and refused to cooperate. The only known information concerning his work record was adduced during his testimony at trial, wherein he claimed to be an unemployed auto mechanic and construction laborer. There is no indication of present mental illness; however, the PSI indicates that he was placed in the California State Department of Corrections at Chino, California for "Diagnostic Commitmentup to 90 days." During the penalty phase, defendant's father, Mit Wilson, testified that his son "had a fever when he was young, some kind of fever messing with his brain." Mit Wilson termed his son "kind of mentally ill." Numerous "track marks" on defendant's arms observed by Dr. Roberts and noted on the Louisiana Department of Corrections Master prison record arguably reflects extensive intravenous drug use; however, no evidence of present addiction exists and no evidence was presented at trial suggesting that he was under the influence of narcotics at the time of the offense.
The victim was a 34 year-old married white male who lived in the area with his wife and two children. He was killed during the course of an attempted armed robbery while assisting what he perceived to be stranded motorists. The victim was unrelated to defendant and possessed a good reputation in the community. He was a candidate for election to the St. Tammany Parish Police Jury at the time of his death. Contrary to a few news reports published after the incident, defendant has never admitted firing the shotgun blast that proved fatal to Stephen Stinson.

Aggravating Circumstances
The jury found the existence of three aggravating circumstances: (1) that the defendant was engaged in the commission or attempted commission of an armed robbery, La.C.Cr.P. art. 905.4(a); (2) that the offense was committed in an especially heinous, atrocious or cruel manner, La.C.Cr.P. art. 905.4(g); and (3) that the offender has a significant prior history of criminal activity, 905.4(c).
The evidence fully supports the finding that the offense was committed during an attempted armed robbery. The defendant's taped confession indicated that while the three of them were on their way to New Orleans they ran out of gas. They decided that they needed to come up with some gas money so they all thought about "flagging down a car and taking their money from them and their car to go over to the station to get gas to come back to get their car." Furthermore, when the defendant was specifically asked whether his motive for this action was armed robbery, he answered "yes."
The defendant refuted this statement at trial; however, defendant's account is somewhat corroborated by the testimony of Larry Benjamin. At trial, Benjamin denied knowledge of, or participation in, a conspiracy to commit armed robbery. Mr. Benjamin's testimony that defendant exited the back seat of the stalled Oldsmobile armed with a shotgun after having informed Benjamin that "[w]ell, I will get you some gas." provides circumstantial corroboration that defendant intended to procure gasoline by means of an armed robbery.
Defendant further admitted in his statement that he participated in an attempted rifling of the victim's pockets after the Volkswagen had come to rest against a tree.
Q. Did anybody search the man [Stinson] or anything such as this to see if he had any money on him?
A. When we first pulled him out, we were just about to start frisking him down when two truck drivers seen the car sitting in the ditch and they immediately stopped and backed up and everybody took off.
Detective Mike Moore, testifying at the penalty stage, observed that the victim, as observed within minutes of the shooting "looked as though someone had attempted to go through his clothing, his jacket was partially pulled over him." Upon review of this evidence, there exists *521 little doubt that the defendant was engaged in an attempted armed robbery when he killed Stephen Stinson. It is submitted that the jury correctly found this statutory aggravating circumstance to be present.
Last term, this Court ruled that a finding that the offender "has a significant prior history of criminal activity" could no longer provide the basis for imposition of the death penalty. State v. David, 425 So.2d 1241 (La.1983). Thus, further review of the jury's finding in this regard is unnecessary as this aggravating circumstance is no longer valid.
The finding that the crime was cruel, heinous and atrocious warrants some discussion. The victim was shot once in the head and neck from a distance of no less than 24 inches with a sawed-off 12 gauge shotgun. Over 200 lead pellets were removed from the victim's head and neck. The left side of Stinson's face and many of his teeth were blown away. All major blood vessels of the upper neck were destroyed including the carotid artery. Clearly, the wound suffered by Mr. Stinson was grossly disfiguring and gruesome.[24] All evidence indicates that the victim was unaware of the impending assault.
Although no one could consider a point blank shotgun blast in the face less than cruel in the generally accepted meaning of the word, the manner of death in this case does not fall within the category of the cruel, heinous and atrocious crimes contemplated by the statute. The test that we have consistently articulated is whether "there was torture or the pitiless infliction of unnecessary pain on the victim", State v. Busby, 164 So.2d 262, (La.1984), No. 84-KA-1089; State v. Sonnier, 402 So.2d 650, 658 (La.1981). That test was not met in this case. The murder must be one in which the death was particularly painful and one carried out in an inhumane manner. State v. Kirkpatrick, supra; State v. Baldwin, 388 So.2d 644 (La.1980). More in line with the heinous and cruelty contemplated by the article are such cases as State v. Rault, 445 So.2d 1203 (La.1984); State v. Flowers, 441 So.2d 707 (La.1983); State v. Willie, 436 So.2d 553 (La.1983). In State v. Rault, supra, the victim was raped, strangled, stabbed in the neck and shot twice. In State v. Flowers, supra, a seventy year old widow was severely beaten, raped and strangled in her home. In State v. Willie, supra, the victim was taken blindfolded and naked to a remote area where she was tied spreadeagle and had her throat repeatedly slashed. She was also raped. The crimes were committed by more than one perpetrator.
This Court recently found the cruel, heinous and atrocious aggravating circumstance in State v. Rushing, 464 So.2d 268 (La.1984). In both that case and the one present the victims were shot in the head at close range by a shotgun. However, the circumstances in Rushing, supra, carried that offense beyond this one into the acceptable category of atrociousness. Thereafter, having shot the victim in the back, the defendant beat the victim in the face and head with his fists. The defendant finally clubbed the victim over the head with the shotgun fracturing the victim's skull three times. This extra violence was *522 sufficient to support a finding of torture or pitiless infliction of unnecessary pain on the victim; something that we find in the instant case to be lacking. It is submitted that the state failed to prove the pitiless imposition of needless pain and suffering beyond a reasonable doubt, therefore, insufficient evidence existed to support the finding of the existence of this circumstance.
However, it should be noted that this court has upheld death sentences when at least one of the aggravating circumstances relied on by the jury is supported by the evidence, even though another aggravating circumstance(s) found by the jury is not so supported. La.C.Cr.P. art. 905.3.[25] This is true as long as the evidence of the possibly unproven circumstances do not inject an arbitrary factor into the proceeding. State v. Rushing, supra; State v. Wingo, 457 So.2d 1159 (La. 1984); State v. Glass, 455 So.2d 659 (La. 1984); State v. Sawyer, 422 So.2d 95 (La. 1983). When there has been a finding of one legally sufficient aggravating circumstance, the failure of another aggravating circumstance does not introduce an arbitrary factor in the sentencing procedure unless this court determines that but for the influence of the evidence of the legally insufficient aggravating circumstance, the jury would not have brought in the death penalty. State v. Rushing, supra.
We must examine the two failing aggravating circumstances to determine whether or not they injected any arbitrary factors into the proceeding.
During the sentencing phase, the state often referred to defendant's criminal record in order to establish that the defendant had a significant prior history of criminal activity. La.C.Cr.P. art. 905.4(c). This court has interpreted La.C. Cr.P. art. 905.2[26] as permitting introduction of the offender's criminal record under these circumstances "irrespective of whether defendant places his character at issue." State v. Sawyer, 442 So.2d 1136, 1140 (La. 1984); State v. Mattheson, 407 So.2d 1150, 1164 (La.1981). It is axiomatic that the convictions per se put the convicted offender's character at issue. State v. Jordan, 440 So.2d 716, 720 (La.1983). It thus follows, that since evidence probative of defendant's character and propensities is always admissible at sentencing, the introduction at sentencing of defendant's prior convictions did not interject an arbitrary factor into his jury's decision process.
Furthermore, Article 905.2 provides that "[t]he jury may consider any evidence offered at the trial on the issue of guilt." During the guilt phase, defendant took the stand and acknowledged possessing a criminal record containing three felony convictions. As the same jury sat during both stages of defendant's bifurcated trial, this allegedly arbitrary factor existed in their minds well before the state's introduction of certified copies of his prior convictions.
The state also alleged that the murder of Stephen Stinson was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr.P. art. 905.4(g). To this end, the state elicited testimony from Detectives Baroni and Moore concerning the condition of the Volkswagen's bloodstained interior and the victim's body. *523 Additionally, photographs of the crime scene and the victim were re-submitted for the jury's inspection. The production of evidence to establish a statutorily prescribed circumstance in aggravation of penalty, although prejudicial to the defendant's interests, clearly does not amount to the introduction of an arbitrary or prejudicial factor sufficient to require the setting aside of the penalty imposed.
We therefore find that the testimony adduced concerning these two failing aggravating circumstances did not inject an arbitrary factor in the proceedings as there was overwhelming evidence of one aggravating circumstance, i.e., that the defendant was engaged in an attempted armed robbery at the time the victim was killed.

Passion, Prejudice or Other Arbitrary Factors
Although the defendant is a black man and the victim was a white male, the record is devoid of any evidence that racial prejudice was a factor in the imposition of the death penalty.
Further, we have already found that there was no arbitrariness in the proceedings as a result of the jury's finding that defendant had a significant prior history of criminal activity or that the crime was conducted in a particularly cruel, heinous or atrocious manner.
Testimony introduced at the penalty phase that defendant showed no remorse over killing the victim also did not interject arbitrariness into the proceedings as this evidence was relevant to the character and propensities of the defendant.[27]State v. Summit, 454 So.2d 1100 (La.1984).
Our review of the record also convinces us that this death penalty was not obtained through the influence of any arbitrary factors.

Proportionality of Sentence
The final focus of this court's sentence review in a capital case is a determination of whether the sentence in the instant case is disproportionate to the penalty imposed in similar cases in the same parish. Both the crime and the defendant must be considered.
In response to the findings within the Uniform Capital Sentence Report, defense counsel does not take issue with the proportionality of the defendant's death penalty to the sentences in other first degree murder cases in the 22nd Judicial District Court. Counsel notes that it is not disproportionate when "compared with other cases from this jurisdiction." Nevertheless, in a capital case, an inquiry must be made to determine whether the sentence imposed is disproportionate, considering both the offense and the offender. Supreme Court Rule 28, § 1(c); State v. Narcisse, 426 So.2d 118 (La.1983). An inference of arbitrariness arises when the recommended sentence is inconsistent with sentences imposed in similar cases in the same jurisdiction. State v. Knighton, 436 So.2d 1141 (La.1983); State v. Sonnier, 402 So.2d 650 (La.1981).
There have been 13 other successful prosecutions for first degree murder in the 22nd Judicial District (which is composed of *524 St. Tammany and Washington Parishes) involving the present statutory scheme. Of these 13 cases, four resulted in the imposition of the death penalty.
State v. Kirkpatrick, 443 So.2d 546 (La. 1983), involved the prosecution of a convicted felon who struck his victim twice over the head with a heavy glass object, implanted a butcher knife into the victim's chest to the hilt, and shot him in the head. The events occurred during an armed robbery in the victim's home and the murder was found to have been committed in an especially heinous, atrocious or cruel manner. The jury recommended death. This Court affirmed.
State v. Joseph Vaccaro, 411 So.2d 415 (La.1982) and State v. Willie, 436 So.2d 553 (La.1983), involved prosecutions of two men for the rape-murder of an 18 year old female. The victim was raped and repeatedly slashed by one of the perpetrators, the other held her hands spread until she died. The state sought the death penalty for each claiming the presence of two aggravating circumstances: (1) that the crime was committed during the perpetration or attempted perpetration of aggravated rape; and (2) that the crime was committed in an especially heinous, atrocious or cruel manner. The jury was unable to reach a unanimous verdict concerning Vaccaro, and the trial court imposed a life sentence without benefit of probation, parole or suspension of sentence. This Court affirmed. As to Willie, the jury found both aggravating circumstances and recommended the death penalty. This Court affirmed the trial court's imposition of the death penalty.
State v. David Rushing, supra, involved the murder of a cab driver during an attempted armed robbery. While seated in the back seat of the cab, Rushing, 18, fired a shotgun through the driver's seat and into the driver's lower back. He then proceeded to beat him about the head and face with the butt of the shotgun and his fists. Rushing was convicted of first degree murder and the death penalty was imposed. This Court has now affirmed his conviction and sentence.
Rushing's co-defendant, Jeffrey J. Fussell, who assisted in the planning of the robbery and picked up Rushing after the homicide, was charged with first degree murder but pled guilty to second degree murder on November 17, 1983.
In an addendum to the Uniform Capital Sentencing Report, Judge Thomas W. Tanner found as a general consideration that defendant has a varied criminal background including convictions involving weapons and "crimes exposing innocent victims to danger." No reference to other cases is made by Judge Tanner who summarily concluded that "[t]he sentence is appropriate." The death penalty for robbery murder is not inherently disproportionate considering the nature of the crime. State v. Summit, 454 So.2d 1100 (La.1984). Adequate support exists for the trial court's assertion of sentence proportionality. The aggravating circumstances found in this case and in Willie, Kirkpatrick and Rushing, were that the killing was committed during the perpetration of a felony (aggravated rape in Willie, armed robbery here and in Rushing and Kirkpatrick). La.C.Cr.P. art. 905.4(A). In this case, the armed robbery was perpetrated allegedly to procure gasoline or transportation. The victim was a motorist, unknown to defendant, whose only indiscretion was the untempered desire to assist a stranded motorist. Furthermore, this homicide can be considered especially senseless as there is no indication that violence of any degree was necessary to effect the defendant's design.
Defendant argued only one factor in mitigation of sentence: that his participation in the homicide/robbery was relatively minor. La.C.Cr.P. art. 905.5(g). The UCSR indicates that the jury did not find this factor to exist. All evidence contradicts defendant's contentions at trial that he was asleep during the homicide. Furthermore, defendant's comment to Benjamin as he exited the car, "I don't give a ______ about killing the ______ ______," indicates a distinct disregard for human life. Defendant also made jailhouse statements to his cell mate and Larry Benjamin during the *525 course of trial proceedings confirming his role as a triggerman and emphasizing his lack of remorse.
Considering the substantial evidence of defendant's guilt, the uncontroverted existence of at least one aggravating circumstance, and the absence of any mitigating factors, the sentence imposed does not appear disproportionate to others imposed by in the 22nd Judicial District.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed.
AFFIRMED
DENNIS, J., concurs.

On Application for Rehearing
DENNIS, Justice, concurring.
I respectfully concur. In the absence of a showing of prejudice, the lack of mention in the court minutes that the indictment was returned in open court does not render the charge invalid.
NOTES
[1] In a death case, this court, as a matter of policy, will review all assignments whether briefed or not. State v. Celestine, 443 So.2d 1091 (La.1983); State v. Narcisse, 426 So.2d 118 (La.1983).
[2] At defendant's trial the testimony of Larry Benjamin indicated that he would be entitled to plead guilty to a lesser offense in exchange for his truthful statements at the trial of defendant. Benjamin, a self-described female impersonator and homosexual, testified that he remained in the Oldsmobile's front passenger seat during the entire incident. His account of the homicide directly contradicts defendant's claim made during his testimony at trial that he (defendant) remained asleep in the back seat of the Oldsmobile throughout the homicide. Material inconsistencies between the co-defendant's accounts shall be footnoted where appropriate.
[3] According to Benjamin, defendant was "either in the ditch on the side of Larry Taylor's car or he was down beside the car ..." Defendant confessed that all three co-defendants joined in a conspiracy to rob whoever stopped to render assistance. According to Wilson, they set out to steal the motorist's money and his car.
[4] Mr. Stinson was a candidate for St. Tammany Police Jury. He had attended church with his wife and two daughters that morning, had gone door to door shaking hands and getting acquainted with various neighbors in his district that afternoon, and had attended two campaign parties that evening. Ernest Perry was one of Mr. Stinson's closest friends and was also his campaign aide. Perry testified that Stinson was on his way to his home in New Orleans East where they were to continue working on the campaign for the rest of the night.
[5] Mr. Benjamin was unable to relate any conversation which conceivably occurred outside of the stalled Oldsmobile as its windows remained closed throughout. Defendant informed police that he flagged Stinson down while Taylor hid in the bushes armed with a shotgun.
[6] Benjamin did not see defendant actually fire the shot that killed Stinson. His conclusion that the victim was shot at close range is consistent with the expert opinion rendered at trial by forensic scientist Pat Lane. Furthermore, the results of an autopsy performed on Stinson's body by Dr. Paul D. Guard, Jr., support the hypothesis that Stinson was leaning over with his face turned when shot.
[7] In his taped statement, defendant insisted that all three co-defendants attempted to remove Stinson's body from the Volkswagen, but were interrupted by the glare of truck headlights which prompted them to flee.
[8] Wilson eventually admitted during his taped statement that the blood on his clothing came from the victim when he was being pulled out of the car.
[9] Contrary to what he had told Deputy Willard, defendant informed Detective Drennan at the scene that the bloodstains were the result of a domestic altercation he was involved in with his brother-in-law which had occurred in New Orleans earlier that evening. Defendant appeared eager to cooperate with the investigation and further informed Detective Drennan that as he was hitchhiking near an interstate underpass, two black homosexual males wearing women's cosmetics and shoulder holsters containing .357 Magnum revolvers approached him and advised him to flee as the police were approaching. At defendant's hearing on his Motion to Suppress Inculpatory Statements, Detective Drennan testified that he was informed by defendant that he was at the murder scene, but "didn't have anything to do with it."
[10] Later, on the morning of October 17, crime scene technician Frey removed a red substance from the palm of Taylor's left hand. Testing indicated that the substance was human blood; however, the cotton swab employed by Officer Frey contained an insufficient sample for blood type analysis.
[11] Defendant gave the detectives the following version of the murder:

Defendant departed Mobile, Alabama accompanied by two black female impersonators known to him only as "Carolyn" and "Ann." Defendant initially described "Carolyn" as "dark-skinned" and "Ann" as tall, heavy-set and "light-skinned." Both were allegedly carrying.357 magnum pistols in shoulder holsters. "Carolyn's" 1978 brown Oldsmobile Delta 88 ran out of gas on Interstate 10 east of New Orleans. As the travelers were without funds to purchase gasoline, all three contemporaneously developed the idea to rob the money and automobile of any motorist who they could flag down. As originally planned, defendant, because he was attired in a three-piece suit, would flag down a motorist while "Carolyn" waited in the bushes armed with a shotgun. "Ann" was to remain in the Oldsmobile. Once a motorist was stopped and engaged in a conversation with defendant, "Carolyn" was to emerge from the bushes with the shotgun and merely scare the motorist. (In contrast to his initial description, defendant, when describing the robbery-homicide, referred to the dark-skinned transvestite as "Ann"). According to the plan, the victim would be tied up and placed unharmed in the bushes. As events unfolded; however, "Carolyn" shot the motorist immediately upon opening the passenger door and prior to any conversation with Stinson. The victim's automobile "took off on its own and went into a ditch." Defendant, "Carolyn" and "Ann" chased the automobile to its resting place and jointly removed the victim from his car. "Carolyn" had placed the shotgun on the ground near the driver's door, and the victim was "rolled ... right on top (of) the gun." As the three were preparing to frisk the victim, headlights were shone upon them by two truck drivers. The three immediately fled the scene.
Defendant further stated that he did not have a firearm during these events. Defendant was unable to explain how the shotgun shell found its way into his pants pocket; however, he did admit that the blood on his clothing came from the victim when he was being pulled out of his car.
[12] The blood of both Stephen Stinson and Larry Benjamin was found to be type "A." The blood of both Larry Taylor and defendant was found to be type "B." Although the substance on defendant's vest was found to be human blood, there was an insufficient amount to conduct an "ABO typing" analysis.
[13] No test presently exists which can conclusively match loose shotgun pellets to a particular firearm.
[14] Mr. Lane based his opinion on an inspection of the X-rays of Stinson's head and a comparison of the number of pellets removed from the victim (200) to the average number of pellets normally contained within a Remington Peters shotgun shell (250-300).
[15] The New Orleans Times-Picayune/States Item included this errant information in single articles appearing on October 17, 18, 19 and 21, and in an article appearing November 30, 1983. Although it had published the correct information in 12 previous articles, the Slidell Daily Times published this misinformation in two articles appearing in its January 3, 1984 edition. The St. Tammany Farmer carried this misinformation in separate reports appearing December 1, 1983, and January 5, 1984. The source for this misinformation appears to have been St. Tammany Parish Sheriff Paul Canulette. New Orleans television station WDSU broadcast six separate reports over an eleven day period, only its first report of October 17, incorrectly reported that defendant had confessed to the shooting.
[16] Art. 797. Challenge for cause.

The state or the defendant may challenge a juror for cause on the ground that:
* * * * * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
* * * * * *
(4) The juror will not accept the law as given to him by the court.
[17] Defendant also complains that he was not provided an opportunity to rehabilitate Mr. Frederick. The District court ruled immediately following questioning of the prospective juror by the prosecution and the judge. Although defendant was not afforded an opportunity to rehabilitate because of the sequence of events, he was not precluded by the court from doing so. Defense counsel noted his objection for the record without requesting an opportunity to rehabilitate Mr. Frederick. Given the wide-ranging voir dire permitted by the district court, it appears that defense counsel's failure to rehabilitate this venireman resulted from his own inaction rather than an unstated unwillingness by the trial court to permit such an effort. Furthermore, this issue is rendered moot by this Court's ruling in James and Edwards, supra.
[18] Art. 215.1. Temporary questioning of persons in public places; frisk and search for weapons

A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspect the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.
[19] Art. 213. Arrest by officer without warrant; when lawful a peace officer may, without a warrant, arrest a person when:

(1) The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit;
(2) The person to be arrested has committed a felony, although not in the presence of the officer;
(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer; or
(4) The peace officer has received positive and reliable information that another peace officer from this state holds an arrest warrant, or a peace officer of another state or the United States holds an arrest warrant for a felony offense.
A peace officer in close pursuit of a person to be arrested, who is making an arrest pursuant to this Article may enter another jurisdiction in this state and make the arrest.
[20] It is not clear from Deputy Willard's testimony at the suppression hearing whether defendant made this statement before or after he was placed under arrest; however, it is apparent from the deputy's testimony during the prosecution's case-in-chief that defendant made this statement after he was arrested and given Miranda rights.
[21] On October 19, 1983, two days after the arrest of the defendant, his counsel requested that he be physically examined and x-rays be taken of him. Defendant's motion was granted and he was physically examined "from head to toe" that day by Dr. Russell Roberts at the St. Tammany-Washington Charity Hospital. At the suppression hearing, defense counsel directed much attention on cross-examination to whether defendant was physically beaten by, or in the presence of, the three testifying officers. At the proceedings on defendant's motion to suppress evidence conducted on February 10, 1984, Dr. Roberts testified that defendant had complained of suffering a beating to the abdomen and chest. The physician's examination produced no evidence whatsoever to substantiate trauma, nor could he elicit any tenderness in defendant's chest region corroborating defendant's "vaguely described" pain. Dr. Roberts concluded that defendant exhibited no evidence of a recent beating. The only physical malady that the defendant was suffering from was gonorrhea which Dr. Roberts treated him for. Defendant reurged his allegations of police abuse and intimidation at trial. Dr. Roberts restated his findings during the prosecution's rebuttal.
[22] Defendant testified at trial that the blood was drawn from him without his consent. He further denied that the encircled "X" was his mark as he claimed to be able to sign his name. (Tr. Transcript, Vol. IV, p. 641). Detectives Moore and Baroni refuted these allegations when called by the state on rebuttal. Furthermore, Sergeant Louis Johnson, Jr., who booked defendant testified on rebuttal that defendant executed the standard booking document by imprinting an encircled "X". (Tr. Transcript, Vol. IV, p. 700).
[23] The PSI indicates that the defendant was convicted of second-degree robbery in 1974; second-degree burglary in 1979; and grand theft property in 1981. Each conviction occurred in Los Angeles, California. The PSI further indicates that defendant has been arrested at least twenty-one times, not including the present offense, since his sixteenth birthday. Included therein, is an arrest in Los Angeles for assault with intent to murder. The disposition of this offense is unknown.
[24] The pathologist who performed the autopsy on Stinson, Dr. Paul D. Guard, Jr., testified at trial that the victim had a crease in his forehead, possibly resulting from striking his head when his VW Rabbit ran into the pine tree as it veered off of the highway shoulder. According to Dr. Guard, the shotgun wound was from the face to the front of the ear. The face was destroyed below the eye. The skin was blown away to the skull and the wound intruded into the upper part of the neck. Mr. Stinson was missing three upper molar teeth and all eight of his lower teeth on the side of the blast. The shot apparently did not enter the brain cavity but all major vessels of the upper neck were destroyed. In the doctor's opinion, death came within a few minutes; between five and seven because of lack of oxygen. The victim was probably rendered unconscious immediately. The two major causes of death were (a) primarily hemorrhaging around the brain stem and (b) strongly influencing this was the aspiration of blood from this area filling up the windpipe and lungs. The victim's unconsciousness was induced by his violent attempts to get air to his brain, resulting in a massive influx of blood into his respiratory system.
[25] A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists, and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed.
[26] Art. 905.2. Sentencing hearing; procedure and evidence.

The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender. The hearing shall be conducted according to the rules of evidence. Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue. Insofar as applicable, the procedure shall be the same as that provided for trial in the Code of Criminal Procedure. The jury may consider any evidence offered at the trial on the issue of guilt. The defendant may testify in his own behalf. In the event of retrial the defendant's testimony shall not be admissible except for purposes of impeachment.
[27] The state called Larry Benjamin who related a conversation with defendant which occurred through the ventilation gate between their adjoining cells in the St. Tammany Parish jail. Benjamin related the following conversation:

A. Okay. he asked mehe was talking to David Rushing, he asked me, "Larry, will I kill a ______ ______?" And I said, "Yes, just like that." And he stated, he said, "You damn right that I will kill," you know, "kill a ______ ______."
* * * * * *
Q. Did he express any remorse about having killed Steve Stinson?
A. Yes. He thought it was very funny. He mentioned about the chair and he said that it didn't make him any difference for all the crimes that he's committed, it didn't really make any difference whether they burnt him or not because, you know, he has done so much in lifetime and he mentioned that he didn't want the hood over his face, you know, he thought it was very funny, and about his last meal request that it would be fried chicken.