JOHNSON, J.,
dissents and assigns reasons:
hi would affirm the decision of the court of appeal. I disagree with the majority opinion finding that the court of appeal erred in reversing the trial court’s denial of defendant’s motion to suppress.
At issue is whether there was probable cause to arrest the defendant pursuant to New Orleans Municipal Code § 54-405. This ordinance provides:
It is unlawful for any person to appear in a public place manifestly under the influence of alcohol, narcotics or other drugs, not therapeutically administered, to the degree that he may endanger himself or other persons of property.
This Court has explained that probable cause to arrest exists when the facts and circumstances within an officer’s knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the accused has committed an offense. State v. Parker, 06-0053, p. 2 (La.6/16/06), 931 So.2d 353, 355; State v. Wilson, 467 So.2d 503, 515 (La.1985), State v. Elliot, 407 So.2d 659, 661 (La.1981). In this case, a violation of the ordinance requires more than mere intoxication. A defendant must be intoxicated to the extent that “he may endanger himself or other persons or property.”
Several Fourth Circuit opinions have examined arrests pursuant to Municipal 12Code § 54-405. In State v. Smiley, 99-0065 (La.App. 4 Cir. 3/3/99), 729 So.2d 743, police officers entered a bar to conduct an investigatory stop of the defendant, who was identified by a citizen on the street as having attempted to sell the citizen drugs out of his truck. Defendant voluntarily exited the bar to speak with the officers. While exiting the bar, the officers noted that the defendant was staggering, and they could smell alcohol on his breath. Thus, the officers arrested him for “public intoxication” to keep him from reentering his truck and driving away while under the influence. The Fourth Circuit found that the police lacked probable cause to arrest the defendant. The court noted that it was unclear under what provision the defendant was arrested. LSA-R.S. 14:103, the disturbing the peace statute, provides in part: “Disturbing the peace is the doing of any of the following in such a manner as would foreseeably disturb or alarm the public: ... (3) Appearing in an intoxicated condition.” The court noted that there was nothing in the officer’s testimony which should have led him to believe that the defendant’s staggering would disturb or alarm the public. The court then looked to § 54-405 of the New Orleans Municipal Code, and again noted that there was nothing in the officer’s testimony which indicated the defendant’s actions at the time he was leaving the bar would endanger the public. The court reasoned that while the officer testified he arrested the defendant to keep him from entering *585 his truck and driving while intoxicated, the officers did not know that the defendant would be leaving anytime soon or that if he were leaving that he would be driving his truck, given the fact that he had two companions with him who could possibly drive, and the officer gave no indication of their condition. Therefore, at the time the officers placed the defendant under arrest, there was no probable cause to arrest him.
In State v. Cambrice, 04-0827 (La.App. 4 Cir. 9/8/04), 884 So.2d 628, police Rhad received citizen complaints about public intoxication and gambling at the Canal Street ferry landing. Officers were patrolling that area in response to the complaints, and found defendant asleep on a bench at the ferry landing at 7:00 a.m. The officers woke defendant and spoke to him, and testified that he smelled strongly of alcohol and had slurred speech. Defendant was arrested for public intoxication under § 54-405. In finding probable cause for the arrest, the court stated that defendant “was obviously intoxicated” to a degree that he might present a danger to himself or others, and his conduct fell within that proscribed by § 54-405. The court noted that defendant was in close proximity to the Mississippi River where he could have stumbled and fallen into the water. The court further noted that there was no one with him to assist him while he was intoxicated so that he did not inadvertently place himself in harm’s way. Moreover, the court noted that he could have been a danger to tourists and others who frequented the ferry landing if he accosted them because of his lack of inhibition due to his intoxication.
In State v. Hawkins, 05-0810 (La.App. 4 Cir. 1/11/06), 923 So.2d 763, while patrolling in a high crime area, officers observed defendant “stumbling, staggering down the sidewalk” and testified that defendant “appeared to be heavily intoxicated.” After stopping the defendant, officers noted that she exhibited slurred speech, her motor skills were impaired, and she reeked of alcohol. Defendant was arrested for public intoxication. The court found no probable cause for the arrest. Although the officers testified that they felt defendant was a danger to the public, nothing in the record evidenced that defendant was behaving in an irrational manner, was incapable of discerning what the officers were asking of her, or that the officers had received any reports regarding an intoxicated person walking down the sidewalk or in the middle of the street. The court further noted that the officer never indicated that ^defendant was weaving into the street, nor was there any indication that there were other persons in the area who might have been disturbed by her presence in an intoxicated state. The court found that defendant’s actions of merely walking down the street in an intoxicated condition, without more, was insufficient to establish that the defendant posed a danger to herself, others, or a disturbance to the public so as to justify a lawful arrest.
In State v. Taylor, 07-0069 (La.App. 4 Cir. 6/27/07), 962 So.2d 480, while on patrol, officers observed defendant riding a bicycle erratically down the street, swerving back and forth. As defendant neared a corner, he rode his bicycle directly into a large, deep pothole and fell off the bike. Officers stopped to see if he needed help, and when they got near the defendant, they could smell the odor of alcohol. Further, defendant’s speech was slurred and he could barely stand. Defendant was arrested for public intoxication. In finding probable cause to arrest the defendant, the court noted the evidence of intoxication, and further stated that because defendant had already ridden into a pothole and fallen off his bicycle, the officers were justi *586 fied in believing that the appellant was both intoxicated and a danger to himself.
The facts presented in this case do not support a finding of probable cause for defendant’s arrest. The arresting officer, Officer Andrew Packer, gave the following testimony at the motion hearing:
Q (Robert Hjortsberg — District attorney): Now, how did you first come in contact with the defendant?
A (Officer Packer): I was on patrol at Canal and North Galvez and observed him walking eastbound on North Galvez.
Q: And, and what initially, ah, made you stop him?
A: Ah, he appeared to be staggering when he was walking, and there weren’t many people outside, immediately noticed him.
The Court:
|fiWhat time of the hour, ah, the hour of night or day, please?
Witness:
I believe it was 2:25am
Q: Now, what led you to put him under arrest—
A: Um—
Q: —as opposed to issuing a summons?
A: Well, he was — the reason why I placed him under arrest was because he appeared intoxicated, and I was concerned that—
The Court:
Was he below Canal or above Canal? Was he walking—
Witness:
He was on the north, the north side, which is actually eastbound of Canal.
The Court:
The 100 block of North Galvez?
Witness: Yes, sir.
* * *
Q: Yes. I just, I just said, what led you to place him under arrest rather than issuing him a summons?
A: Ah, I wanted, for his own safety, to remove him from the area he was in. Also, he appeared very intoxicated. I didn’t want him to wander off into traffic and get hit by a car, um, to get robbed. Like I said, he was in a very high-crime neighborhood, so I felt it was most appropriate to place him under physical arrest.
⅜ ⅜ ⅜
Q: All right. Now, just one more question about, about the specific area where he was arrested. Um, you stated that it was a high-crime area. Is — when you say, “high crime,” are you referring to robberies, murder, drugs?
A: Ah, we’ve routinely, ah, handled a lot of drug activity in that area but also, shootings and homicide in the area. Robberies, also. Um—
* * ⅜
h;Q: Just one more question about the Miranda warning. Did the defendant appear to understand the Miranda warnings? Did he understand his rights once you read them to him?
A: Well, when I asked- — I always ask at the end whenever I read someone their Miranda rights if they understand what I’ve just read to them, and they, he said “yes.”
Mr. Hjortsberg:
Okay. I have no further questions at this time your Honor.
The Court:
Anything further by the Defense?
Mr. Touzet (Defense Attorney):
Yes, your Honor, I have a few questions.
The Court: Take your time, please, sir.
Mr. Touzet:
*587 Thank you, your Honor.
Cross Examination (Jacque Touzet-de-fense attorney)
Q (defense attorney): I’m Jack Touzet. I represent Mr. Wells.
A (Officer Packer): Good morning, sir.
[[Image here]]
Q: Okay. Well, fair enough. But he’s on the sidewalk, lake side of North Gal-vez, walking away from Canal Street, away from the convenient (sic) store?
A: That’s correct.
Q: Okay. And your observation was that he appeared intoxicated?
A: That’s correct.
Q: Okay. Now, did you receive any call or complaints? Did a motorist stop and say, “Hey, there’s a drunk guy just left the convenient store”? Did you get any complaints—
A: No, sir.
Q: —about Mr. Wells? Neither by phone or in person?
A: That’s correct.
|7Q: Okay. No, no phone, no complaints?
A: No complaints.
Q: Ah, did you ever see him fall — you said he appeared to be staggering. Did you see him fall, fall into a fence, or fall into the streets?
A: No, sir.
Q: Okay. And, um, did he run into any passer-by? Of course, it’s 2:30 in the morning. Did he run into anybody else coming on the sidewalk, possible injure them?
A: No, sir.
Q: Okay. And, um, I went yesterday at rush hour, and, ah, I didn’t see many cars on that street. Did he wander into traffic, or did you see a car swerve around him?
A: Ah, no, sir, but there is heavy traffic on North Galvez and Canal, sir.
Q: Okay. At 2:30 in the morning?
A: No, but there is traffic still.
Q: Okay. I’m not disputing that.
A: Okay.
Q: Okay. Now, um, when he, when you did stop him, did — and you talking about Mirandizing him. He understood that, correct?
A: Yes, sir.
Q: And if — you wouldn’t have questioned him if you felt that he was too incapacitated to understand the right you had read him, right?
A. I’m sorry. Can you repeat that?
Q: You would never have questioned him had he not understood the rights that you read him?
A: I would have questioned him regardless of his condition to determine—
Q: Okay.
A: —exactly what his condition is based on my experience and opinion, and I still would have read him his Miranda rights, whether or not, in my opinion, I thought he could understand it.
|SQ: Well, that was my question, though. But you, you don’t usually elicit statements from people who are basically incoherent or that are obviously intoxicated?
DA: I’m going to object, Judge. He answered the question.
Court: As to what he might usually do, I would sustain that.
Touzet: Okay.
Court: If that’s where you’re going.
Touzet: Next question then.
Q: Um, did he behave in an irrational manner? Like when you were talking to him, did he walk in circles or start *588 barking at the moon? Did he act irrationally?
A: Irrational as far as barking at the moon?
Q: No, I’m—
A: There was no barking.
Q: No, I’m just — I’m not saying he did. Did he act irrational? Just answer that question. I gave you an example, but—
A: Can — can—based on your example, no.
Q: Okay.
[[Image here]]
Q: Okay. Now, um, was he incapable of discerning what you were asking him? Did he seem like he wasn’t understanding what you were asking him, or did— you, you pulled him over, and you talked to him right?
A: That’s correct.
Q: So did he seem like he didn’t understand what you were saying, or did he understand you?
A: I have no way of knowing whether or not he understood me, sir.
Q: To your recollection based on what you’ve read in your report and what you remember from six months ago.
A: I have no way of knowing, sir, whether or not he understood what I was saying to him.
Q: I’m not asking what he knew. I’m asking to your, from your observations—
IflA: Uh-huh.
Q: — did he appear to understand what you were saying to him? Did he understand the situation that you were a police officer?
A: Yes, sir.
Q: Did he—
A: I believe he — I believe so.
Q: That’s all I need to know. OkeyfOkay], And did he give you any false information.
A: Not that I can recall.
Q: Very good. All right. Now, part of being a police officer is not just driving down the street and not looking around. You have your feelers out a night, right? A: Sure.
Q: That’s part of patrol, right?
A: Absolutely.
Q: Okay. And, and you said that, um, besides intoxication, you said you felt there was intoxication. In your report, the next thing you said, he’s in a high-crime area. Isn’t that right?
A: Ah, if that’s what the report states, then, yes.
Q: Okay. And you talked about it today.
A: Absolutely. Sure.
Q: And the area post-Katrina is a little rough. It’s a little bombed out. There’s a lot of houses missing, right?
A: Ah, yeah. It’s, it’s a rough neighborhood.
Q: Okay. All right. And, um, I want to ask, did you see any hand-to-hand transactions involving Mr. Wells?
A: No, I did not.
Q: Okay. Um, and you’ve probably seen a hundred crack, crack pipes in your time. Did you see any crack pipes or anything, any paraphernalia visible while he was walking down the sidewalk?
l1ftA: I do not recall arresting him with a crack pipe or any paraphernalia.
Q: Irrespective of what was taken off of him, did you see anything that would alert you like paraphernalia? Did you see any unusual lumps or a bag? Did you see anything like that that would *589 alert you to say, “Huh, something’s wrong here”?
A: It’s — something that, to alert me as if something’s wrong?
Q: Yes.
A: The reason why I stopped him was ‘cause I believed something was wrong.
Q: Well, no, no. That was intoxication.
A: Uh-huh.
Q: I’m saying, did you see anything else that was associated with crime? Like, did you see a pistol sticking out of his pants? Nothing—
a: No, no pistol.
Q: Okay. And finally, did you see — did he attempt to throw anything down? Is this a throw-down case?
A: No, this is not a throw-down case.
Q: You didn’t see him try and separate himself from anybody or anything, did you?
A: No.
[[Image here]]
Q: Um, let’s go back to intox. Um— and I’m — I read your report, and it just said, “Mr. Wells appeared to be intoxicated.” That’s what you said this morning, as well. Let’s go down a list, though. Did you feel he was staggering?
A: I, I observed him.
Q: Did you see him stagger?
A: Yes, sir. I observed him stagger.
Q: Okay. You said he didn’t fall. Was he stumbling? Did he — once again, did he have to hold onto the wall to—
A: I didn’t observe him holding on—
i •+■ * *
i _Lu
A: Um, as far as his, his condition, I didn’t observe him holding onto a wall. Um, I did observe him staggering. By, by staggering, I mean, he was cross-stepping. And, if you, if that makes any sense. Not walking in a straight line.
Q: Uh-huh.
A: Um, and that led me to believe that there was something wrong.
Q: Okay. And when you spoke with him, did he have slurred speech?
A: Slightly. It was it was rapid. His speech was rapid, however.
Q: Okay. Well, that’s um, that’s a pretty big, that’s a pretty big item. That shows intoxication, doesn’t it, slurred speech?
A: In most cases.
Q: Okay.
A: In some cases.
Q: Well, you prepared—
A: That, coupled with the, the staggering led me to believe that he was intoxicated.
Q: Okay. But you prepared this report about 35 minutes after the stop, correct?
[[Image here]]
Q: Well, I began preparing the report, um, immediately. Ah, to, to book the defendant, ah, a fact sheet and a gist have to be used, so, um, I began part of the report immediately, taking his name, birthday, and other relevant information.
Q: Okay. But you never mentioned any slurred speech in either your gist or in your report. (Emphasis added).
A: Ah, by mentioning intoxication, sir, I feel that that’s mentioning.
Q: So you’re supplementing your report today—
A: Sir?
Q: —with—you’re supplementing your report today with your testimony that he had slurred speech; is that correct?
|12A: That’s part — I mention that in my, ah, initial report by mentioning that he was intoxicated.
*590 Q: Intoxicated. And what you’re saying is that you feel that that included slurred speech?
A: And, and many other factors that go along with intoxication. We’re just defining it.
Q: All right. Well, let’s — I have another one. Did you smell alcohol on him?
A: No. (Emphasis added)
Q: Okay. So I assume that the intoxication component really was the — the big — the heart of the matter was the staggering, and you just, that you just mentioned, the not being able to walk quite on a straight line on the sidewalk; is that correct?
A: The staggering, the speech, his overall demeanor, and appeared, he appeared to be intoxicated.
[[Image here]]
Q: And, once again, you didn’t do a field-sobriety test in this case did you? You didn’t do a Nystagmus, walk and turn, anything like a DWI stop, did you? A: No, I did not.
Q: Okay. So as the Judge just said, you looked at overall factors, visual factors, to determine that he was probably intoxicated?
A: Yes, sir, and may I add that, um, the Traffic Division with the New Orleans Police Department, ah, train the traffic officers to do field-sobriety tests and also the Intoxalyzer.
Q: Uh-huh.
A: Regular patrol officers like myself, um, detectives like myself, we’re, we’re not trained to do that. So we, under no circumstances, um, are trained to give field-sobriety tests and the like. We transport them to a special division that does that—
Q: Sure.
A: —when they’re driving
Q: Sure.
11SA: And they will not do it for public intoxication arrests.
Q: Certainly. So if you got, pull over a DWI, you’re gonna have DeFillo go do the field sobriety and the tests, right?
A: That’s correct.
Q: Okay. So — let’s see what else we have in your report. Did you observe— the first time you observed him was on the sidewalk, or did you see him leave the gas station?
A: No, I observed him on the sidewalk.
Q: Okay.
A: I learned that he left the gas station from his own statement.
Q: And then after the fact because of what you found, you asked him to relocate the, ah, to the gas station, see if you can make an additional arrest, correct?
A: Right. He, he — we asked him after he was already under arrest, already Mirandized, if he would identify the person that sold him the cocaine, and, which he was already under arrest, but he did, ah, consent for us to relocate him there.
Q: Okay.
A: Um, and he was unable to identify anyone.
Q: So he was actually not only coherent, he was helpful? Just trying to — he complied with your — •
A: Well, he was not helpful, but he, um, appeared coherent enough to give consent to, you know, to identify someone if he saw them. (Emphasis added)
Q: So in your opinion, he was sober enough to be able to finger another perpetrator?
A: Well, obviously not, because he did not identify the perpetrator, so it’s unknown whether or not he would have been able to.
Q: That’s not my question. But in your opinion at the time, you felt-
*591 [[Image here]]
Q: In your opinion, at the time, you felt he was sober enough to go to another location and possibly, and possibly identify another person, correct? He was sober enough to do that, right?
|UA: Sober enough to identify someone that sold him something? Is that what you’re asking me?
Q: Not, not, I’m not — I’m saying you felt he was sober enough to bring him to another location and attempt to identify another person, correct?
Mr. Sims: Judge, I’m—
Witness: Sure.
Mr. Sims:
—gonna object to that.
The Court:
I’ll overrule that.
Mr. Sims:
Sober enough to bring him? He’s bringing him. He - doesn’t have to be — he could be completely unconscious for this officer to bring him— The Court:
I overrule that, sir, with all respect. Mr. Touzet:
It’s overruled. And I think he’s answered.
Q: But can you say your answer again for the question? You said—
A: I said — I said, “yes.”
Mr. Touzet:
Okay. That’s all I need. Thank you, your Honor.
The Court:
Anything further?
Mr. Touzet:
No.
The Court:
Anything further?
Mr. Hjortsberg:
Yes, your Honor.
Redirect (District Attorney)
Q: Um, when — -after you Mirandized the defendant, did he verbally | ^signify that he understood his rights?
A: Yes, he did. He said, “yes.”
Q: And at the time, did you believe that he understood his rights?
A: I believed he did, because he said, “yes.”
Based on Officer Packer’s testimony, I agree with the court of appeal’s conclusion that the evidence presented does not conclusively show that the defendant was incapacitated to such an extent that he would endanger himself. The testimony revealed:
• Officer Packer observed the defendant walking on a sidewalk about 2:25 a.m. and defendant appeared to be staggering.
• Officer Packer arrested defendant for his own safety to remove him from the high crime neighborhood-to prevent him from wandering into traffic or from getting robbed.
• Mr. Wells appeared to understand his Miranda rights.
• The police had not received any calls or complaints about Mr. Wells, or about an intoxicated person walking down the street.
• Officer Packer never saw Mr. Wells fall.
• Officer Packer never saw Mr. Wells run into anyone else on the sidewalk.
• Officer Packer never saw Mr. Wells walk into traffic or cause any vehicles to have to swerve around him.
• Mr. Wells did not behave irrationally.
• Mr. Wells did not give any false information.
• Officer Packer never saw Mr. Wells involved in any drug transactions.
• Officer Packer never saw Mr. Wells with any drug paraphernalia.
*592 • Officer Packer never saw Mr. Wells with a weapon.
• Officer Packer never saw Mr. Wells discard anything, or separate himself from anyone or anything.
|1(i* Mr. Wells did not have to hold onto anything to walk.
• Mr. Wells exhibited slightly slurred speech, and his speech was rapid. (Although Officer Packer did not include slurred speech in his report or gist)
• Officer Packer did not smell alcohol on Mr. Wells.
• Officer Packer believed that Mr. Wells was coherent enough to consent to relocate with the Officer to the gas station where Mr. Wells allegedly bought cocaine in order to potentially identify the seller.
Unlike the underlying facts in the cases finding probable cause for arrest under the ordinance, Mr. Wells did not smell of alcohol, he had not fallen down in the street, he had no trouble standing, and officers were not responding to specific citizen complaints about a particular crime or activity. Moreover, the testimony reflects that Mr. Wells had no difficulty comprehending the officer’s questions, no difficulty responding to the officer coherently, and exhibited not slurred, but rapid speech, and minor staggering. Based on the facts presented, I find that this case is more factually similar to Hawkins, supra, wherein the court found no probable cause for arrest.
In my view, defendant’s action of merely walking down the street in an alleged intoxicated condition, even in a high crime area, without more, is insufficient to establish that he posed a danger to himself, others, or a disturbance to the public so as to justify a lawful arrest. The only danger alleged by the State was the theoretical possibility of danger to the defendant because he might wander into traffic, or may possibly be the victim of a crime. Had officers observed the defendant engaged in the exact same behavior while walking through another area of the city, such as the French Quarter, I doubt that the officers would have stopped and arrested him. Otherwise, tourists exhibiting the same behavior while walking down Bourbon Street would routinely be arrested. Moreover, based on the State’s arguments in this case, anyone exhibiting slight signs of intoxication would be arrested under the ordinance |17for their own protection if they happen to be in a “high crime area.” I must conclude that the same constitutional protections apply to defendants, no matter where the arrest occurs.
Finally, contrary to the majority opinion, I do not find that the court of appeal erred in examining the record de novo, without any deference to the trial court’s credibility calls and factual findings. It is clear that the court of appeal accepted Officer Packer’s testimony that the defendant appeared intoxicated, staggered as he walked, and spoke in a rapid manner. However, the court of appeal concluded that based on this testimony, the totality of the circumstances did not support the trial court’s finding of probable cause because of what Officer Packer did not state. Officer Packer did not testify that the defendant reeked of alcohol, had trouble standing, acted irrationally, spoke incoherently, or lurched towards the roadway. Such legal conclusion was one for the court of appeal to make de novo in the exercise of its supervisory jurisdiction. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).
For the above reasons, I would affirm the decision of the court of appeal.